## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PETER J. SCHERER, as Personal )
Representative of the ESTATE OF CARL )
S. SCHERER, )
)
      Plaintiff, )
)
v. )
)
PENNSYLVANIA DEPARTMENT OF )
CORRECTIONS; JEFFREY A. BEARD, )
Ph.D.; JOHN M. McCULLOUGH; )
HENRY A. TATUM; GEORGE N. )    CIVIL ACTION NO. 3:2004-191
PATRICK; JAMES OLIVER; WEXFORD )
HEALTH SOURCES, INC.; )
MOHAMMAD KHALID KHAN, M.D.; )
MUHAMMAD ZAHID HUSAIN, M.D.; )
JOAN ELIZABETH BAILEY; FAMILY )
CARE CLINIC GROUP & I.M.E., LLC )
a/k/a FAMILY CARE CLINIC GROUP & )
IMPARTIAL MEDICAL EXAMINERS )
CORP. a/k/a FAMILY CARE CLINIC )
GROUP & IMPARTIAL MEDICAL )
EXAMINERS a/k/a IMPARTIAL LOCUM )
TENENS; MICHAEL G. OCILKA; )    JUDGE GIBSON
FRANCIS J. SCHUSTER; NORENE P. )
GREENLEAF; EUGENE F. )
POLMUELLER; JAMES B. SMITH; )
TRACEY R. HOYT; JANE/JOHN DOE )
MENTAL HEALTH PROFESSIONALS/ )
PROVIDERS #6-10; JANE/JOHN DOE )
CORRECTIONS OFFICERS #3-10; JANE/ )
JOHN DOE UNIT MANAGERS #1-10; )
JANE/JOHN DOE COUNSELORS #1-10, )
)
      Defendants. )

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

Before the Court is the Defendants, Pennsylvania Department of Corrections (hereinafter "DOC"), Beard, McCullough, Tatum, Patrick, Oliver, Bailey, Greenleaf, Ocilka, Schuster, Smith and Hoyt's (hereinafter collectively "Corrections Defendants") Motion to Dismiss Amended Complaint (Document No. 104), Defendant Mohammad M. Khan, M.D.'s (hereinafter "Khan") Motion to Dismiss/Motion for Summary Judgment (Document No. 114), Defendant Zahid Husain, M.D.'s (hereinafter "Husain") Motion to Dismiss Amended Complaint, or in the alternative, for Summary Judgment (Document No. 115), Defendant Family Care Clinic Group & I.M.E.'s (hereinafter FCCG)[1] Motion to Dismiss Plaintiff's Amended Complaint, or in the alternative, Motion for Summary Judgment (Document No. 125), Wexford Health Services, Inc.'s (hereinafter "Wexford") Motion for Summary Judgment (Document No. 135) and Peter J. Scherer, III's (hereinafter "Plaintiff") Motion Seeking Leave to File a Second Amended Complaint to Add Count III (Document No. 137). For the reasons set forth in the following analyses[2], the Court will grant in part and deny in part each motion as explained in the analysis herein.

Without reciting the entire factual history of this civil action, the Court notes that this matter arises from the death of a mentally ill prisoner at the Pennsylvania State Correctional Institution at

---

[1]"FCCG" will be used to collectively refer to the Defendant, Family Care Clinic Group & I.M.E., LLC a/k/a Family Care Clinic Group & Impartial Medical Examiners Corp. a/k/a Family Care Clinic Group & Impartial Medical Examiners a/k/a Impartial Locum Tenens.

[2]For the convenience of the reader, each motion for summary judgment has those proposed undisputed statements of material fact that the Court has found to be material and undisputed in accordance with Local Rule of Court 56.1 placed prior to the respective analysis of that motion. Any facts not included within such sections is an indication that such proposed facts were found by the Court to be immaterial, disputed or not supported by the record.

Houtzdale (hereinafter "SCI-Houtzdale"), a facility administrated by the DOC. The prisoner, Carl S. Scherer (hereinafter "Decedent" or "Scherer") was afflicted with mental illnesses including schizophrenia, bipolar disorder and chronic paranoia and was killed at the hands of his cellmate Michael Monica (hereinafter "Monica"). Monica was since convicted of voluntary manslaughter. *See* Document No. 135-2, p. 1. Monica and the Decedent were housed in the same cell (a procedure known in the DOC as double-celling) in the Restrictive Housing Unit (hereinafter "RHU") in SCI-Houtzdale at the time of the killing. The Decedent was originally assigned to the RHU in a cell by himself after being found guilty of a misconduct for threatening another inmate. Plaintiff alleges that the Defendants have violated the Decedent's rights under the Eighth Amendment freedom from cruel and unusual punishment, the Americans with Disabilities Act (hereinafter "ADA"), and the Rehabilitation Act (hereinafter "RA") in their actions or inactions in treating the Decedent's mental illness and their manner of housing the Decedent prior to and including the day of his death. The operative pleading at this time is the Plaintiff's Amended Complaint (Document No. 101). Wexford is the only defendant that has answered the Amended Complaint. *See* Document No. 103.

We turn first to the Corrections Defendants' Motion to Dismiss.

## I.    Corrections Defendants' Motion to Dismiss (Document No. 104)

### A.    Motion to Dismiss Standards

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6):

the district court [is] required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *D.P. Enters., Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir. 1984). In determining whether a claim should be dismissed under Rule

12(b)(6), a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record.

*Jordan v. Fox, Rothschild, O'Brien, & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 1275 S.Ct. 1955, 1969, 167 L.Ed.2d 929, 945 (2007) (citations omitted). A complaint that states "a plausible entitlement to relief" is the complaint that survives a Rule 12(b)(6) motion as well as satisfies the Rule 8 pleading requirements. *Id.* at __, 1275 S.Ct. at 1964-65, 1967, 167 L.Ed.2d at 940, 942. In considering a motion to dismiss, the Court is not deciding the issue of whether "plaintiffs will ultimately prevail" but is deciding if the plaintiffs "are entitled to offer evidence to support their claims". *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

## B.    **Analysis**

**1**

The Corrections Defendants have moved for dismissal of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) submitting several arguments in support of the motion. First, the Corrections Defendants request another review of the statute of limitations defense they pursued in their previous Motion to Dismiss (Document No. 14) and Motion for Reconsideration (Document No. 42). When analyzing this defense originally, the Court found that the Plaintiff had stated a cause of action within the statute of limitations because of the application of the continuing violation doctrine. The Court in its memorandum opinion addressing the Corrections Defendants' Motion for Reconsideration relied upon *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122

4

S.Ct. 2061, 153 L.Ed.2d 106 (2002) and *Cowell v. Palmer Township*, 263 F.3d 286 (3d Cir. 2001) to conclude that the continuing violation doctrine is applicable in the context of 42 U.S.C. § 1983 claims based upon the Eighth Amendment. At that time, the Corrections Defendants had argued that *Morgan* only applied to Title VII matters such as claims of "hostile work environment" or "ongoing discrimination," *see Memorandum Opinion* (Document No. 51) p. 6, but this Court concluded to the contrary and applied it in the present context of an Eighth Amendment. Corrections Defendants now offer that the opinion of the Court of Appeals for the Third Circuit in *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) authored after this Court's decision on the motion for reconsideration establishes "supervening new law" in accordance with *Africa v. City of Philadelphia*, 158 F.3d 711 (3d Cir. 1998) because the *O'Connor* opinion recognized that the Supreme Court's application of the continuing violation doctrine in *Morgan* was not limited to Title VII workplace discrimination. The Court cannot disagree with the *O'Connor* opinion inasmuch as it confirms our previous view that the *Morgan* decision did not restrict the continuing violation doctrine to the Title VII context. While *O'Connor* recognized that the Third Circuit had not previously "stated expressly in a published opinion that *Morgan*" applies to *employment discrimination* cases outside of Title VII, *O'Connor* at 440 F.3d 125, 128 n. 4, the Third Circuit expressly stated "that the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law." *O'Connor* at 440 F.3d 125, 128 (3d Cir. 2006). However, our previous decision on the motion for reconsideration was based upon *Cowell* in which the Third Circuit recognized that it has been applied outside of that context. *Cowell* at 292.

5

In the memorandum opinion that set forth the Court's ruling on the motion to dismiss the Complaint, this Court found that the "continuing wrong" doctrine of *287 Corporate Center Associates v. Township of Bridgewater*, 101 F.3d 320, 324 (3d Cir. 1996) applied.[3] At the time of their Motion for Reconsideration the Corrections Defendants took the position that the continuing violation doctrine was restricted to employment discrimination, but this Court referred them to *Cowell* for the purpose of demonstrating that it was not. *O'Connor* only adds to this discussion the fact that the entire realm of *employment discrimination* cases may have the continuing violations doctrine apply to it as the Third Circuit's opinion demonstrates. *Cowell* and *287 Corporate Center Associates* recognized long before *O'Connor* the application of the continuing violations doctrine outside of the employment discrimination context. Now the Corrections Defendants attempt to read *O'Connor* out of context as providing a broad application of the continuing violations doctrine outside of Title VII matters to civil actions generally when in fact it compared continuing violations with "discrete acts", as analyzed in *Morgan*, and recognized their application to the realm of all employment discrimination actions. The Corrections Defendants once again ignore the explicit language of *Cowell*:

---

[3]The Court finds no difference between the "continuing wrong" and the "continuing violation" doctrine as a description of the continuing wrong doctrine set forth below presents a description equal in terms to the continuing violation doctrine:

> Sameric contends, however, that the "continuing wrong" doctrine, which tolls the statute of limitations, renders its claim based upon the denial of the demolition permit timely. Under this doctrine, a federal cause of action based upon the defendant's continuing conduct is timely provided that the last act of that continuing conduct is within the period for the commencement of an action specified by the statute of limitations. *See 287 Corporate Ctr. Assocs.*, 101 F.3d at 324 (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir.1991)). In applying the doctrine, this court focuses on the affirmative acts of the defendant. *See id.*

*Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998)

> The continuing violations doctrine has been most frequently applied in employment discrimination claims. *See, e.g., West v. Philadelphia Electric Co.*, 45 F.3d 744; *Bronze Shields, Inc., v. New Jersey Dept. of Civil Serv.*, 667 F.2d 1074, 1081 (3d Cir.1981); *Jewett v. Int'l Tel. and Tel. Corp.*, 653 F.2d 89, 91 (3d Cir.1981). However, this has not precluded the application of the doctrine to other contexts. *See Brenner*, 927 F.2d 1283 (applying the doctrine to a claim brought under the National Labor Relations Act); *Centifanti v. Nix*, 865 F.2d 1422, 1432-33 (3d Cir.1989) (applying the doctrine to a procedural due process claim brought under § 1983).
> \*\*\*
>
> After consideration of the jurisprudence on the continuing violations doctrine, we do not find it necessary to adopt a *per se* rule of its applicability to substantive due process claims. Most importantly, the doctrine is an equitable one and requires a factual analysis that will be different for each case. Therefore, we will limit ourselves to whether the continuing violations doctrine should apply to the plaintiffs' substantive due process claim in the case at hand.

*Cowell v. Palmer Twp.,* 263 F.3d 286, 292, 293 n.5 (3d Cir. 2001). The Court does not find any recognition in *O'Connor* as to the application of the continuing violations doctrine outside of Title VII states new law, or if it does, such new law does not impact upon this Court's previous analysis and conclusion.

Moving forward to the present argument, the Corrections Defendants argue that a number of allegations set forth in paragraphs 85 and 95 of the Amended Complaint allege "discrete acts" that cannot be salvaged from the statute of limitations bar by a theory of continuing violations. Despite the protestations of the Corrections Defendants, this Court has applied the continuing violations doctrine finding that the Corrections Defendants engaged in patterns of conduct that evidence discrimination against the Decedent in violation of his rights under the Eighth Amendment, ADA and RA. While allegations that the Corrections Defendants "recklessly plac[ed] Scherer in an RHU cell", Amended Complaint ¶ 85 (c), is indeed one act, it is an act that is a part of a course of conduct, conduct that is

7

alleged to have violated the Decedent's rights under the Eighth Amendment, ADA and RA. It is the position of the Corrections Defendants that this act as well as others are actionable in and of themselves. However, the Court does not view the acts questioned by the Corrections Defendants as individually actionable. Specifically, the Court views the placement of the Decedent in the RHU as an act which is part of a pattern of conduct alleged against the Corrections Defendants that allegedly violated the Decedent's rights as a person with mental illness. This act evidences and is part of the alleged lack of professional attention and care that the Plaintiff views as a continuing pattern of discrimination in the Corrections Defendants' manner of treatment of prisoners, such as the Decedent, who are afflicted with mental illnesses. It suffices to state, without reviewing each of the allegations challenged by the Corrections Defendants, that the Court views the allegations of the Amended Complaint, not as discrete acts, but as a pattern of conduct supporting the application of the continuing violations doctrine. Therefore, there is no basis to revisit our previous ruling on the application of the continuing violation doctrine.

**2**

Proceeding to the Corrections Defendants' remaining arguments, the second argument seeks dismissal of the Amended Complaint for a lack of specificity as to "conduct, time, place and persons responsible for the alleged violations asserted therein." Corrections Defendants' Brief, p. 13. Presumably, the Corrections Defendants present these arguments only as to the newly added or amended portions of the allegations found in the Amended Complaint, but not the original Complaint, as they could have made these arguments in their previous motion to dismiss as to those Defendants named in the original Complaint, and have since waived making such an argument again in this Rule 12(b)(6)

8

motion. *See* Fed.R.Civ.P. 12(g).[4] Therefore, the Court will review this argument as to the newly added Defendants only.

As for the Corrections Defendants' argument, the Court disagrees. The Amended Complaint complies with *Twombly* as it states valid causes of action. The Amended Complaint makes clear that there are alleged violations of the Eighth Amendment right to be free from cruel and unusual punishments, the ADA and the RA with these violations occurring when the Decedent was in the custody of the Corrections Defendants, particularly in SCI-Houtzdale, and occurring by the actions taken in light of their knowledge of the Decedent's mental condition, the conditions of confinement at SCI-Houtzdale, and the limitation of mental health treatment at SCI-Houtzdale. The dates of confinement are known to the Corrections Defendants, and the specific dates of occurrences outlined in the Amended Complaint orient the Corrections Defendants sufficiently in order to comply with Federal Rule of Civil Procedure 8. The Corrections Defendants citation of Judge Conti's adoption of Magistrate Judge Hay's opinion in *Elliot v. Dorian*, 2007 WL 120031 (W.D.Pa. January 10, 2007), specifically page four of the Westlaw pagination, refers to lack of personal involvement by superiors and the application of *respondeat superior* liability. *Elliot* is thus inapposite to the present situation where the added Corrections Defendants Ocilka, Schuster, Greenleaf, Smith and Hoyt allegedly took actions violating or failing to act to protect the Decedent's rights. On this argument, the motion is denied.

---

[4]This of course does not cause loss of these defenses, only a restriction in the manner of later presentations to the Court. See Fed. R. Civ. P. 12(h)(2).

9

Third, the Corrections Defendants once again argue for dismissal of the claims made against the supervisory Corrections Defendants in Count I (the Eighth Amendment claim) for lack of personal involvement. Claims made pursuant to 42 U.S.C. § 1983 against supervisors must establish the personal involvement of supervisors, which may include allegations of "actual knowledge and acquiescence." *Rode v. Dellaciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The Plaintiff has made such an allegation here despite the arguments of the Corrections Defendants. The Court reviewed this issue in the Memorandum Opinion (Document No. 41) of May 9, 2005, and notes that the only difference between the allegations in Count I of the Complaint and the Amended Complaint is a difference in paragraph numbering and the addition of Polmueller, Schuster and Greenleaf at paragraph 86, but it is otherwise the same content as set forth in paragraph 72 of the Complaint. Thus, only the new allegations need to be addressed. The Court sees no deficiencies for purposes of Federal Rule of Civil Procedure 8, and finds the Plaintiff has met the notice pleading requirements of the Federal Rules of Civil Procedure. In particular, the Court notes that the Plaintiff has alleged personal involvement of Beard, McCullough, Tatum, Patrick, Polmueller, Schuster and Greenleaf by alleging their "aware[ness] of the woefully inadequate mental health services provided to inmates at DOC facilities, including at SCI-Houtzdale and were aware of the widespread abuses and deliberate indifference towards the serious medical needs of inmates who had serious mental illness, yet failed to take action to prevent further violations of the rights of individuals housed in these facilities." Amended Complaint (Document No. 101) ¶ 86.

The Plaintiff also included a new allegation in the Amended Complaint that states that Bailey, Ocilka, Patrick, Tatum and McCullough specifically had "knowledge of Scherer's chronic and acute mental illness...observed that Scherer was double celled with Monica, yet took no action to house Scherer in an appropriate location consistent with his severe mental illness and/or to protect Scherer from Monica." Amended Complaint, ¶ 61. Also added the allegation that Schuster knew of Scherer's "acutely psychotic state" as of "July 8, 2002". Amended Complaint, ¶ 50. These acts are viewed as being within the statute of limitations by operation of the continuing violation doctrine. The lack of action, despite the Corrections Defendants' arguments, is evidence of acquiescence which coupled with their knowledge provided liability for the supervisory Corrections Defendants. Ocilka, although not apparently holding a supervisory position, is sufficiently alleged to have personally acted or been inactive in his care of the Decedent. The *personal involvement* of the remaining Correctional Defendants, Smith, Hoyt and Oliver, is also sufficiently plead in terms of Smith's actions in overseeing the double-celling of the Decedent with Monica, *see* Amended Complaint, ¶ 58, and Hoyt and Oliver's reaction on the day of the Decedent's death. Amended Complaint, ¶ ¶ 66-67. The Corrections Defendants arguments as to Hoyt and Oliver that they are not alleged to have been involved in the Decedent's medical treatment are correct, but they fail to recognize that a violation of the Eighth Amendment may occur through a defendant's "know[ledge] of and disregard[ing] [of] an excessive risk to inmate health or safety." *Farmer*, *infra* at 837. Such is the allegation being made by the Plaintiff here. These paragraphs present new allegations not contained in the original Complaint. Furthermore, the Corrections Defendants' implicit and explicit arguments that the Decedent was being medically treated for his mental illness, thus foreclosing any possible claim of deliberate indifference is incorrect.

11

*See* Corrections Defendants' Brief (Document No. 105), p. 16. This argument is incorrect as the Third Circuit has recognized the existence of claims for deliberate indifference to the medical needs of a prisoner in spite of the fact that treatment was being provided. *See e.g. Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)(recognizing "deliberate indifference" in the act of "persist[ing] in a particular course of treatment 'in the face of resultant pain and risk of permanent injury'")(quoting *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990)).

In light of the added specificity of the Amended Complaint, the Court is satisfied that the necessary requirements of alleging personal involvement of the Corrections Defendants in a § 1983 claim, whether acting as supervisors or not, have been met.

4

The fourth argument of the Corrections Defendants is that the Amended Complaint does not establish that they were deliberately indifferent to the Decedent's "serious medical needs." Specifically, the Corrections Defendants argue that those among them who are medical professionals actually treated the Decedent for his mental illness and their actions or inactions do not establish deliberate indifference to a serious medical need of the Decedent, while the non-medical Corrections Defendants cannot be held liable under § 1983 when they are aware of the "competent" treatment being provided to the Decedent. Corrections Defendants' Brief, pp. 18-27. The Plaintiff disagrees arguing that the Corrections Defendants are presenting a defense previously ruled upon by this Court as to the original Complaint and that, in addition, Plaintiff's claimed liability as to the Corrections Defendants' deliberate indifference to the Decedent's serious medical needs, also rests upon the theory of "deliberate indifference to an inmate's safety". Plaintiff's Brief (Document No. 126), pp. 20-21. The Plaintiff once

12

again cites *Farmer* for this proposition and notes that the Supreme Court has held that "deliberate indifference is a factual question left for the jury and therefore should not be decided on a motion to dismiss...." Plaintiff's Brief, p. 23.

As to those Corrections Defendants who provided medical care, they too can be liable for their deliberate indifference to a serious risk of harm to the Decedent as well as deliberate indifference to his serious medical needs.

Count I of the Amended Complaint, has been amended to re-number its paragraphs and to add "Polmueller, Schuster and Greenleaf" at paragraph 86, formerly paragraph 72 of the original Complaint. Thus, once again, with the exception of allegations made as to "Polmueller, Schuster and Greanleaf", the Corrections Defendants are presenting arguments that should have been raised in their previous motion to dismiss the original Complaint. *See supra*, pp. 8-9. And although the Court recognizes that medical treatment for the Decedent's mental illness was provided, it must be reiterated that simply providing medical treatment does not defend against claims of deliberate indifference to medical needs. *See Rouse, supra.* On the other hand, it is clear that action or inaction amounting to negligence by medical professionals does not equate with an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251, 261 (1976). The Court also agrees with the Correctional Defendants' citation to *McCabe v. Prison Health Services*, 117 F.Supp.2d 443, 450 (E.D.Pa. 1997)(citations omitted) which instructs: "[m]ere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation". However, these applicable standards do not apply to the claims made against "Polmueller, Schuster and Greenleaf". These newly added Defendants are sufficiently alleged to have "knowledge and acquiescence" on their part as to

13

"woefully inadequate mental health services being provided to inmates at DOC facilities". Amended Complaint ¶ 86. These allegations of liability are sufficient to survive a motion to dismiss under Rule 12, despite the fact that the Decedent allegedly received medical treatment.

As to the non-medical Corrections Defendants, including Smith, Hoyt and Greenleaf, the Plaintiff has again alleged that they as well as all Defendants are liable as to their alleged deliberate indifference to the serious risk to the Decedent's safety *and* serious medical needs by their alleged actions and inactions. The Corrections Defendants fail to acknowledge the full meaning of this allegation which was contained in both the original and Amended Complaints, *see* Complaint (Document No. 1), ¶ ¶ 71, 73 and Amended Complaint ¶ ¶ 85, 87, and attempt to confine their understanding of the Plaintiff's claim as one exclusively based upon deliberate indifference to serious *medical needs* of the Decedent. The Corrections Defendants failed to address this issue previously in the original Complaint, and their discussion of its dismissal now is nevertheless meritless as the Plaintiff has stated a sufficient claim under both theories. The Court agrees with the Correctional Defendants that non-medical defendants cannot harbor "deliberate indifference" under an Eighth Amendment claim of deliberate indifference to a serious medical need unless they are aware that the prison's medical professionals are "mistreating (or not treating) a prisoner". *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Only Greenleaf is alleged to be aware of such mistreatment or failure to treat the Decedent. Amended Complaint ¶ 86. Smith and Hoyt are not alleged to have such awareness. Furthermore, it has already been noted that with respect to violations of the Eighth Amendment regarding serious medical needs, Greenleaf as a supervisor within the Pennsylvania Department of Corrections is alleged to know

14

of and to have acquiesced in the "woefully inadequate mental health services" provided to state prisoners. Nevertheless, the newly added Corrections Defendants in non-medical assignments, Smith, Hoyt and Greenleaf, are alleged to have been deliberately indifferent to the concerns for the Decedent's safety as well. Therefore, all three of the newly added Correctional Defendants with non-medical positions are allegedly liable under a theory of deliberate indifference to the Decedent's safety while only Greenleaf is also alleged to have been deliberately indifferent to the Decedent's serious medical condition while in the DOC's custody. The Plaintiff will be granted twenty days to file a limited amendment to the Amended Complaint to set forth facts, if possible, that demonstrate Hoyt and Smith had the necessary knowledge that establishes their possible liability for a deliberate indifference to the Decedent's serious medical needs.

The Corrections Defendants' argument that claims against Smith are time-barred is further denied based upon our analysis of the continuing violations doctrine, *supra*. In addition to the allegation specifically claiming Smith made the decision to "double-cell" the Decedent with his assailant Monica, all Defendants are implicated in the allegations of paragraph 85 and the Correctional Officers who are Defendants are alleged to have been deliberately indifferent to the Decedent's medical and safety needs as alleged in paragraph 87. Such allegations meet the notice pleading requirements of Federal Rule of Civil Procedure 8.

The Correctional Defendants also argue that Smith, Hoyt and Oliver, are not alleged to "possess[] the *scienter* requirement of deliberate indifference." The argument as to Oliver has already been waived as he is not a newly added Defendant. The Court has already addressed this issue above by recognizing that only Greenleaf (not Smith and Hoyt) has been alleged to have been deliberately

15

indifferent to the Decedent's serious medical needs; Smith and Hoyt remain as Defendants for their alleged liability as to their deliberate indifference to the "substantial risk of serious harm". *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811, 828 (1994). Here the Corrections Defendants only challenge the *scienter* requirement as stated in *Spruill*, *supra*, as to Hoyt and Smith's knowledge of the Decedent's mental illness. The Court agrees and finds that the Hoyt and Smith cannot be liable under Count I for an alleged violation to the Decedent's Eighth Amendment right to be free from cruel and unusual punishments as to serious medical needs. *See supra*, pp. 14-15. However, Smith and Hoyt remain as Defendants under Count I as to the Plaintiff's claim that they are alleged to have been deliberately indifferent to the Decedent's "substantial risk of serious harm." *Farmer, supra.*

**5**

The fifth argument of the Corrections Defendants is that the Plaintiff "has failed to amend his complaint to conform to the requirements set down by the Supreme Court in *United States v. Georgia.*" Corrections Defendants' Brief, p. 28. Specifically, the Corrections Defendants note that the Amended Complaint does not clearly state whether the Plaintiffs' ADA claims rest upon "conduct by the DOC or the Corrections Defendants that does or does not independently violate the Eighth Amendment." *Id.* The Plaintiff in response argues that he has stated a claim under the ADA as previously recognized by this Court, but does not specify the actions underlying the claim are the same actions relied upon in his Eighth Amendment claim. Plaintiff's Brief, pp. 23-24.

This Court previously dismissed the Plaintiff's ADA claim finding that the Eleventh Amendment was "not validly abrogated" by the enactment of the ADA when the ADA claims are based on conduct violating the Eighth and Fourteenth Amendments. Memorandum Opinion (Document No.

41), p. 24. Subsequently, the Supreme Court in *United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) recognized that an ADA claim made against a state "for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia* at 159, 126 S.Ct. 877, 882, 163 L.Ed.2d 150, 650, 659. The matter was remanded to the Eleventh Circuit to allow amendment of the petitioner's complaint for the purpose of pleading which conduct allegedly violated Title II of the ADA *and* the Fourteenth Amendment, and which conduct solely violated Title II of the ADA and for this latter conduct, if the state's Eleventh Amendment sovereign immunity was properly abrogated as to such an ADA claim. *Georgia* at 159, 126 S.Ct. 877, 882, 163 L.Ed.2d 150, 650, 660. On the basis of *Georgia*, the Plaintiff *sub judice* requested reconsideration of the dismissal of his ADA claim and, being both meritorious and unopposed, the reconsideration was granted. *See* Motion for Reconsideration (Document No. 97) and Memorandum Opinion and Order (Document No. 100). Corrections Defendants now seek dismissal of the Plaintiff's reinstated ADA claim arguing that the Plaintiff did not comply with *Georgia* in that he has not delineated what conduct is allegedly in violation of Title II of the ADA and the Fourteenth Amendment and which conduct is alleged to violate only Title II of the ADA, and therefore, this Court cannot conduct a proper analysis of the Corrections Defendants' sovereign immunity pursuant to the Eleventh Amendment. Corrections Defendants' Brief, p. 28. The Corrections Defendants also argue that because they have proven their lack of liability as to any Eighth Amendment claims made against them, any of the Plaintiff's ADA claims cannot withstand dismissal inasmuch as those claims are linked to the valid abrogation of the Eleventh Amendment. This latter argument fails in view of this Court's conclusions today that the Plaintiff has stated viable claims under the Eighth and Fourteenth Amendments. As to the ADA claims not based

17

upon conduct violating the Fourteenth Amendment, the Court agrees with the Corrections Defendants and their citation to *Miller v. King*, 449 F.3d 1149, 1151 (11th Cir. 2006) in support of their argument that the Plaintiff must first delineate what conduct of the Corrections Defendants violated Title II of the ADA, but did not violate the Fourteenth Amendment, and second why Congress' enactment of the ADA must be viewed as having abrogated Pennsylvania's sovereign immunity with respect to the claims based upon such conduct.

The Plaintiff has referred the Court to his previous brief at Document Number 19 and the arguments made therein originally in response to the Corrections Defendants' previous motion to dismiss. Plaintiff's Brief, p. 24 n. 9. However, this earlier-filed brief does not present a discussion counseled by the later-filed Supreme Court opinion in *Georgia*. Therefore, the Corrections Defendants' motion to dismiss is granted in part as to any of the Plaintiff's claims based upon Title II of the ADA, as set forth Count II of the Amended Complaint, to the extent such ADA claims are not based upon conduct violating the Fourteenth Amendment. The Plaintiff's ADA claims, as currently set forth, are assumed to be based upon conduct that also violates rights protected by the Fourteenth Amendment as such ADA claims have been found by the Supreme Court in *Georgia* to have abrogated the sovereign immunity of the states. If the Plaintiff wishes to make any claims under Title II of the ADA based upon conduct not in violation of the Fourteenth Amendment, the Plaintiff will be granted 20 days to file a limited amendment to his current Amended Complaint only as to the Corrections Defendants. In the absence of such an amendment to the Amended Complaint, the Court will assume that the Plaintiff's Title II ADA claims are based solely upon conduct that violates the Fourteenth Amendment.

18

The Corrections Defendants' final argument for dismissal of the Plaintiff's Amended Complaint concerns the merits of the Plaintiff's ADA and RA claims. Corrections Defendants claim that the Amended Complaint contains nothing more than allegations complaining of the nature of the treatment of the Decedent and do not establish any discrimination occurred based on the Decedent's disability of mental illness but at most are allegations of "medical malpractice." Corrections Defendants' Brief, pp. 30-31.

It is noted that the ADA and RA are interpreted identically. *Yeskey v. Commw. of Pennsylvania, Dept. Of Corrections,* 118 F.3d 168, 170 (3d Cir. 1997). To establish a *prima facie* case for these statutes the following elements must be established: "(1) [plaintiff] is a qualified individual with a disability; (2) [he] was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of [his] disability." *Calloway v. Boro of Glassboro Dept. of Police*, 89 F.Supp.2d 543, 551 (D.N.J. 2000).

The only portions of Count II of the Amended Complaint that have been amended are the paragraph numbers and the addition of the phrase "Such discrimination included, but was not limited to:" in paragraph 95. However, paragraph 89 incorporates paragraphs 1 through 88, which include many additions to the factual allegations not presented in the original Complaint. Among these additions is the allegations that the DOC revoked support for the paroling of the Decedent based upon his mental illness (Amended Complaint ¶¶ 42, 43) and that the Decedent was placed in the RHU with "[n]o consideration or accommodation [being ] given to [the Decedent's] mental illness in determining the

type of discipline notwithstanding that RHU confinement would have no rehabilitative effect due to Scherer's mental illness and would only exasperate Scherer's condition." Amended Complaint ¶ 57. The Plaintiff focuses on these two actions as bases for his ADA and RA claims. Plaintiff's Brief, pp. 23-24. We address the parole allegation first.

One circuit has recognized that "categorically" denying parole to a prisoner based upon his mental illness would violate the ADA, but denying parole for that prisoner after considering his disability of mental illness through an individual assessment of his potential to recidivate if paroled would not violate the ADA or RA. *Thompson v. Davis*, 295 F.3d 890, 898 n. 4 (9th Cir. 2002). This case appears to be the limited leading authority regarding discrimination, in violation of the ADA, against a mentally ill prisoner considered for parole. Although not legally binding on this Court and only persuasive in its nature, the Ninth Circuit authority of *Thompson* is adopted by this Court in the absence of Third Circuit precedent to the contrary. The Plaintiff's Amended Complaint supports a similar claim of discrimination against the Decedent because of the allegation that DOC "revoked its institutional support for Scherer's parole because of Scherer's mental illness." Amended Complaint ¶ 42. The Corrections Defendants' Motion is denied as to this argument.

The Plaintiff next attempts to establish that the Corrections Defendants engaged in discrimination by arguing that the Decedent's mental illness caused his outward conduct that resulted in disciplinary action and thus, the disciplinary action taken by the Corrections Defendants was because of his mental illness and in violation of the ADA and RA. Plaintiff's Brief, p. 24. The Plaintiff alleges that the disciplinary act of housing the Decedent in the RHU, without "consideration or

20

accommodation" of "Scherer's mental illness in determining the type of discipline...would have no rehabilitative effect due to Scherer's mental illness and would only exasperate Scherer's condition." Amended Complaint ¶ 57. The Court is at a loss to see how a service or program was not provided to the Decedent because of the fact that he was disciplined. The Decedent was disciplined for his conduct, conduct that the Court must assume for purposes of this motion to dismiss was a result of the Plaintiff's mental illness. There is no indication that the Decedent was disciplined differently from other prisoners because of his disability, only that the Plaintiff believes the Decedent's discipline should have been meted out with a consideration of his disability. The Plaintiff's challenge to the manner of discipline is meritless.

The fact that a prisoner possesses a qualifying disability of mental illness under the ADA and RA does not mean that any discipline imposed upon him must be a measured imposition of discipline in light of his disability. This is because the discipline of RHU housing imposed on the Decedent does not equate with denying benefits to the Decedent. *See Atkins v. County of Orange*, 251 F.Supp.2d 1225, 1231-1232 (S.D.N.Y. 2003)(finding that placement of mentally ill inmates within "keeplock isolation" did not equate to a denial of services under the ADA in the absence of an allegation of such denial; mentally ill inmates were not disparately treated from other inmates who were also a "danger to [themselves] or others"). The Plaintiff was placed in the RHU for threatening another inmate, with such threats allegedly resulting from the Decedent's mental illness. Nevertheless, the placement of Decedent in the RHU did not result from the hearing officer's discrimination against prisoners with mental illness, rather, it resulted from the "misconduct". Amended Complaint ¶ 57. Any implication in Amended Complaint at Paragraph 57 that the Decedent could not be disciplined by being placed in the RHU

21

because it would be detrimental to his mental health and thus violative of the ADA and RA is not denial of a service or program under such statutes. The Court understands that the Plaintiff's claim under the ADA and RA relates to the proper treatment of the Decedent through the services and programs made available to him in light of his disability. The Court does not believe the ADA or RA requires housing of disabled inmates in a certain level of confinement, a certain institution, or a certain security level as such assignments are primarily matters of security delegated to the discretion of the individual state correctional departments. *See Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 459 (1976)(finding the due process clause does not create a right to hearing prior to a prisoner's transfer from one prison to another).

The Court also does not find that certain facilities or their specific housing units are distinct services or programs under the ADA. As the Seventh Circuit concluded: " [I]ncarceration, which requires the provision of a place to sleep, is not a 'program' or 'activity.' Sleeping in one's cell is not a 'program' or 'activity.'" *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).[5] To the extent the Plaintiff claims the Decedent was denied transfer to a different facility or housing unit within the same facility based upon discrimination as to his disability, such an allegation does not state a claim. However, if the Plaintiff was denied transfer to a different housing unit or facility, one that is designed to medically meet the needs of his mental illness through programs and services provided therein, such a claim would appear to state a cause of action under the ADA and RA if such a denial was made

---

[5]The Seventh Circuit assumed for this conclusion that the ADA would apply to prisons, although it had already concluded that it believed this was not Congress' intention. The decision of this case was prior to the recognized application of the ADA to prisons as found by the Supreme Court in *Pennsylvania Dept. Of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

because of the Decedent's mental illness. *See Pennsylvania Dept. Of Corrections v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 1955, 141 L.Ed.2d 215 (1998)(noting that "[m]odern prisons provide inmates with...medical 'services'"). The Amended Complaint clearly implies that the Decedent was receiving medical care of some level because the Plaintiff has alleged that "Husain ordered Scherer, who remained double-celled with Monica in the RHU, to begin taking the medication Artane." Amended Complaint ¶ 64. It appears that the Plaintiff's issue with the Decedent's placement in the RHU was that it was an inappropriate punishment in light of the Decedent's mental illness and that the discipline meted out should have been confinement to the Special Needs Unit (hereinafter "SNU") not the RHU. In essence, the Plaintiff is arguing that a mental illness defense for the Decedent should have been considered to explain his misconduct and/or establish his punishment. However, it does not appear from the Amended Complaint that the Decedent was treated differently from other prisoners who receive a misconduct report for threatening other prisoners.

As for the Plaintiff's claim of denial of mental health services to the Decedent because of his confinement in the RHU, this fact is belied by the allegation that such services were provided by Husain. Additionally, the Plaintiff has referred to depositions taken in discovery that support this argument, but the Court is not converting the Corrections Defendants' motion to dismiss into one for summary judgment by considering such matters that are not incorporated into the Amended Complaint. In the end, it is unclear from the Amended Complaint what the SNU provided in the manner of services for mentally ill prisoners as compared to the RHU, but it is the Plaintiff's contention that the failure of the Corrections Defendants to consider the differences and the need for such services is discrimination under the ADA and RA. However, the Decedent's placement in the RHU was for misconduct and as

23

the Plaintiff alleged in Paragraph 57 of the Amended Complaint, that placement was without consideration to the Decedent's "mental illness", and without such consideration, no discrimination based upon the Decedent's mental illness can occur. The Corrections Defendants motion is granted as to this argument on the ADA and RA claims and no amendment appears to be able to cure this defect.

## II. Husain, Khan, FCCG and Wexford's Motions to Dismiss and/or For Summary Judgment

Defendants Husain, Khan, FCCG and Wexford have all filed motions requesting dismissal of the Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) or in the alternative, summary judgment pursuant to Federal Rule of Civil Procedure 56. In light the voluminous discovery already completed and incorporated into the record for these motions, the Court finds that it is appropriate to consider all of these motions as motions for summary judgment.

### A. Summary Judgment Standards Generally

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the duty of the movant to establish that the record demonstrates an "absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

"The substantive law [identifies] which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202, 211 (1986). As to the genuineness of an

24

issue of material fact, an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202, 212.

The non-movant can defeat a motion for summary judgment provided that he produces "affirmative evidence" beyond the content of his pleadings that demonstrates the existence of a genuine issue of material fact that remains for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). "Such affirmative evidence-regardless of whether it is direct or circumstantial-must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460-461 (3d Cir. 1989)).

In reviewing a motion for summary judgment, the Court is obligated to "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

## B.   **Eighth Amendment and 42 U.S.C. § 1983 Standards**

It is well known that 42 U.S.C. § 1983 creates no "substantive rights, but provides a remedy for the violation of rights created by federal law." *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995)(citation omitted). Therefore, in order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must "demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Id.*(citation omitted). The parties do not make any arguments in their motions that concern the "color of law" element and therefore, the Court focuses on the nature of the rights alleged to have been violated.

> The Eighth Amendment to the Constitution prohibits "cruel and unusual punishments" U.S. Const. Amend. VIII. This amendment is applicable to state governments through the application of the Fourteenth Amendment's due process clause. *See Cooper*

25

*Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433-434, 121 S.Ct. 1678, 1684, 149 L.Ed.2d 674, (2001). Among the protections afforded convicted prisoners by the Eighth Amendment is medical care: [The] elementary principles [of the Eighth Amendment] establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.

\*\*\*

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra*, at 173, 96 S.Ct. at 2925 (joint opinion), proscribed by the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 103-104, 97 S.Ct. 285, 290-291, 50 L.Ed.2d 251, 259-260 (1976). This standard set forth in *Estelle* has been interpreted by the Court of Appeals for the Third Circuit as follows: "The standard enunciated in *Estelle* is two-pronged: '[i]t requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious.'" *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)(citation omitted). "First, plaintiff must make an '*objective*' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a '*subjective*' showing that defendant acted with 'a sufficiently culpable state of mind.' *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)." *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002). It has been recognized that "[a] medical need is 'serious,'...if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.' *Pace v. Fauver,* 479 F.Supp . 456, 458 (D.N.J.1979), *aff'd,* 649 F.2d 860 (3d Cir.1981)". *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

26

When speaking of deliberate indifference, medical "malpractice" or a difference in belief "as to the proper medical treatment" do not equate to deliberate indifference. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1997). In determining deliberate indifference, a subjective test is applied to the actions of prison officials :

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. See Prosser and Keeton §§ 2, 34, pp. 6, 213-214; *see also* Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680; *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer v. Brennan,* 511 U.S. 825, 837-838, 114 S.Ct. 1970,1979, 128 L.Ed.2d 811, 825-826 (1994).

As *Farmer* indicates, risks to inmate safety are another type of harm the Eighth Amendment protects against. "For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*, at 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811, 823 (1994)(citation omitted)(footnote omitted).

As has already been discussed in the analysis of the Corrections Defendants' Motion to Dismiss, the Plaintiff has sought to assign liability for violations of the Eighth Amendment not only for the

27

Defendants' deliberate indifference to the serious medical needs of the Decedent, but also for the

Defendants' deliberate indifference to serious risks of harm. The Third Circuit has framed such a claim

as follows:

> For an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must be met. First, the prisoner must demonstrate "that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834, 114 S.Ct. at 1977. This element is satisfied when the alleged "punishment" is "objectively sufficiently serious." *Id.* Second, the prison officials involved must have a sufficiently culpable state of mind. *Id.* at 838, 114 S.Ct. at 1979 ("[O]ur cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment."). Specifically, the inmate must show that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.*
>
> Consequently, to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir.1993).

*Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

With this understanding of prisoner claims pursuant to the Eighth Amendment, the Court

proceeds first to analyze Husain's motion.

**C.**   **Husain's Motion to Dismiss Amended Complaint, or in the alternative, for Summary Judgment (Document No. 125)**

    **1.**   **Statements of Undisputed Fact[6]**

        **a.**   **Dr. Husain's Statements Admitted to by Plaintiff**

1) During the time period at issue, Mohammad K. Khan, M.D. provided psychiatric care and treatment to inmates at various Pennsylvania Department of Corrections...facilities pursuant to an ["Independent Contractor Agreement"] between Defendant Wexford Health Sources, Inc....and his group, Family Care Clinic Group & I.M.E., LLC a/k/a Family Care Clinic Group & Impartial Medical Examiners Corp. a/k/a Family Care Clinic Group & Impartial Medical Examiners a/k/a Impartial Locum Tenens....

2) FCCG is a privately owned, for-profit corporate entity that has been in existence since approximately January 2, 2001.

3) At all relevant times, FCCG was organized as a professional corporation ("PC") or limited liability corporation ("LLC"), and not a partnership or sole proprietorship.

---

[6]For purposes of this motion and all other motions for summary judgment analyzed herein, the Court retains the numbering assigned by the parties to the proposed statements of material fact in order to orient the parties and reader as to which proposed statements have been accepted by the Court.

4) Impartial Locum Tenens[7] [a part of the FCCG corporate organization] was created on the advice of Dr. Khan's accountant so that locum tenens and full-time employees could be...accounted for [separately].

5) Pursuant to the aforementioned ["Independent Contractor Agreement"] with Wexford, which was amended several times, FCCG agreed to provide on-site and/or on-call psychiatric services at various DOC facilities, including SCI-Houtzdale.

9) On October 30, 2000, Wexford entered into an ["Independent Contractor Agreement"] with FCCG to provide on-site psychiatric care to inmates at SCI-Camp Hill for a minimum of 36 hours per week.

10) On August 17, 2001, that ["Independent Contractor Agreement"] was amended, with FCCG agreeing to provide on-call psychiatric services to inmates at a number of DOC facilities, including SCI-Houtzdale.

11) Dr. Fisher, the full-time, resident psychiatrist at SCI-Houtzdale, left SCI-Houtzdale in late June of 2002.

12) FCCG, pursuant to its August 17, 2001 [amendment provided] for on-call psychiatric services [to inmates at SCI-Houtzdale following] Dr. Fisher's departure....

---

[7]Locum tenens is a term used throughout the record and this Memorandum Opinion to refer to psychiatrists employed on a short-term basis for FCCG.

30

13) On August 1, 2002, FCCG's ["Independent Contractor Agreement"] with Wexford was again amended, with FCCG agreeing to provide on-site psychiatric care at various facilities, including SCI-Houtzdale.

14) With respect to SCI-Houtzdale, the ["Independent Contractor Agreement",] amended on August 1, 2002[,] called for 35 hours of on-site psychiatric coverage per week.

15) FCCG was not compensated directly by the DOC; rather, the DOC paid Wexford, who in turn paid FCCG.

16) FCCG [paid] Husain....

17) Dr. Khan testified at his deposition that neither he nor FCCG accepted federal funding.

18) Plaintiff has not developed any evidence indicating that Dr. Khan or FCCG accepted federal funding of any kind.

19) Dr. Husain graduated from Chittagong Medical College in 1989.

20) Thereafter, he completed a one-year internship in general medicine and a one-year residency in internal medicine, both at Chittagong Medical College Hospital.

21) Dr. Husain then worked for two years in the Bangladesh health department as a family practitioner.

22) After coming to the United States in 1993 on a student visa, Dr. Husain passed the United States Medical Licensing Examination in 1994, worked for a time and then enrolled in a master's degree program in public health at the University of Alabama-Birmingham ("UAB") in 1996.

31

23) During his studies at UAB, Dr. Husain had the opportunity to shadow some practicing psychiatrists.

24) Thereafter, in 1998, Dr. Husain was accepted into UAB's psychiatric residency program, which he completed in 2002.

25) At the time that he entered into the independent subcontract with FCCG and was working at SCI-Houtzdale, Dr. Husain was a licensed psychiatrist.

30) On July 17, 2002, Dr. Khan assessed Plaintiff's decedent, Carl Scherer ("Decedent") in a Psychiatric Observation Cell ("POC"), discontinued Decedent's lithium...and medically cleared Decedent for discharge from the POC pending approval by security.

31) Dr. Khan explained at his deposition that he medically cleared Decedent for discharge from the POC because it was his assessment that Decedent no longer needed "acute, inpatient care."

32) Following his discharge from the POC, Decedent was placed in a Special Needs Unit ("SNU") cell.

33) On July 22, 2002, Dr. Khan again assessed Decedent, and re-started Decedent on lithium given his agreement to take medications and expressed feeling that lithium helped with his mood and paranoia.

34) Dr. Khan also ordered the drug Seroquel and follow-up regarding lithium level, BUN, creatinine, thyroid stimulating hormone, [and] CBC with differential....

32

35) Dr. Husain took over, from July 23, 2002 through August 27, 2002, the hours of psychiatric coverage at SCI-Houtzdale previously provided by Dr. Khan.

36) Dr. Husain worked 67 hours at SCI-Houtzdale between July 23, 2002 and July 31, 2002, and worked 8 hours on August 2, 2002, 10 hours on August 5, 2002 and 6 hours on August 6, 2002.

37) Dr. Husain reviewed Decedent's lab results on July 30, 2002 and determined that Decedent's lithium level was sub-therapeutic, but noted that Decedent had already been started on lithium.

38) On August 2, 2002, Dr. Husain ordered that Decedent be given the drug Artane (trihexyphenidyl).

39) Dr. Husain explained at his deposition that Artane is usually given to mentally ill patients to prevent extrapyramidal symptoms of antipsychotic medications.

40) Psychiatrists such as Dr. Khan and Dr. Husain saw inmates at a given DOC facility pursuant to a pre-established schedule developed by an on-site administrator/coordinator.

41) Day-to-day evaluation of mentally ill inmates was handled by the psychologists and counselors employed by the DOC.

43) When a mentally ill inmate (such as Decedent) was released from the POC, he would be re-assigned to a particular prison unit not by the psychiatrist, but rather by the Program Review Committee consisting of the facility Deputy Superintendents.

33

46) Z-code status[8] was generally determined by the Unit Manager, Counselor and RHU Officer, and then approved through the chain of command via a vote sheet.

47) Cell placements within the RHU were made by an RHU sergeant or lieutenant....

### b. Plaintiff's Statements Admitted to by Husain

1) Wexford and DOC entered into a comprehensive Medical Services Agreement ("MSA") effective June 1, 2002, which sets forth the medical services, including psychiatric services Wexford agreed to provide to DOC facilities. The MSA covered SCI-Houtzdale.

2) The psychiatric services to be provided under the MSA are set forth in Attachment Two dated April 10, 2001. Excerpts are attached as Exhibit A.

3) Section 2.26.1 specifically sets forth the Psychiatric Services Wexford was to provide to inmates at Houtzdale at the time from June 1, 2002 until the time of Scherer's death.

4) Section 2.26.1 sets forth mental health programs and services that are to be provided as part of the MSA.

5) Section 2.27 states that "Wexford will ensure that all inmates have access to mental health services at a quality level comparable to that available in the community and in accordance" with numerous standards and policies.

6) Section 2.27 states that the mental health services will include, *inter alia*, 1) Psychiatric Assessment, Evaluation and Diagnosis; 6) Multidisciplinary Treatment Planning & Psychiatric Review

---

[8]Although not included in the statements accepted by the Court, it should be noted for the reader's information that Z-code status is a housing status indicating that a prisoner must be single-celled.

Team; 8) Individual and Group Interventions; 10) **Evaluation of inmates housed in administrative**

**or disciplinary confinement, or Protective / Close Management.** (emphasis added).

7) Section 2.27.12 states the following:

Wexford psychiatrists will provide evaluation and treatment for inmates placed in psychiatric observation cells, special needs units and **restrictive housing units**. Inmates in psychiatric observation cells and the special observation unit will be assessed daily or more often if clinically indicated. **Psychiatrists will assess inmates with serious mental illness in the restricted housing unit weekly** and evaluate inmates in the special needs units every thirty days or as according to Department Policy.

Weekly rounds will be completed, or more frequently if needed, **in the restrictive housing units** and special needs unit to interview and observe inmates with mental illness. According to Department policy, the psychiatrist will make the appropriate documentation for each inmate served, and note any significant changes, mental status, plans for continued treatment and recommendations.

**Wexford staff will assist the staff in these units with strategies to interact with identified inmates that will significantly decrease the chances of the inmate decompensating.**

(emphasis added).

8) Sections 2.27.15 and 2.27.16 provide that psychiatrists will participate in a Psychiatric

Review Team and that **"Wexford staff will also make recommendations regarding housing or job**

**assignments and other changes as requested."** (emphasis added).

13) Dr. Husain completed his residency program in psychiatry in June of 2002.

14) In the spring of 2002, Dr. Husain saw an advertisement [in *Psychiatric Times*] placed by

Dr. Khan to work in Pennsylvania and contacted Dr. Khan.

17) Prior to seeing inmates at DOC facilities, Dr. Husain had only been in a correctional

institution one time for half a day observing.

35

18) Prior to starting to work for...FCCG, Dr. Husain does not recall meeting with any representative from Wexford.

19) Prior to starting to work for...FCCG, Dr. Husain does not recall receiving any policies and procedures regarding caring for inmates with mental illness.

20) Prior to starting to work for...FCCG, Dr. Husain does not recall receiving any instructions about how frequently he should see inmates in the RHU.

21) Shortly after starting at [SCI-]Camp Hill, Dr. Khan asked Dr. Husain to move to [SCI -] Houtzdale.

22) While at Houtzdale, Dr. Husain reported to Dr. Khan.

24) On the day of Scherer's death (August 6, 2002), Dr. Husain was providing psychiatric services at [SCI-]Houtzdale.

25) On August 29, 2002, less than two months after being hired by FCCG...Dr. Husain quit and returned to Alabama.

26) Dr. Husain said in his disposition he knew nothing about credentialing with Wexford and claimed that Dr. Khan "worked it out" with Wexford.

27) Dr. Khan stated in his deposition that "Dr. Husain directly provided that [credentialing information] to the Wexford staff."

28) No defendant has produced any documents establishing Dr. Husain's credentials were submitted to Wexford ....

31) Scherer was an individual who suffered from a long history of serious mental illness. Scherer had been diagnosed with numerous mental illnesses, including schizophrenia, bipolar disorder and chronic paranoia.

32) Scherer suffered from severe and chronic mental illness while housed at Houtzdale, which was well documented in the medical records at Houtzdale.

33) Dr. Husain reviewed Scherer's medical records as part of providing the psychiatric services and knew that he was suffering from mental illness.

34) Dr. Husain participated in psychiatric review team meetings.

36) Dr. Husain cannot recall if he ever saw Scherer in the RHU.

37) The medical records show that Dr. Husain made two entries in Scherer's medical records, one on July [30], 2002 and one on August 2, 2002. On August 2, 2002, Dr. Husain placed Scherer on Artane.

39) On July 30, 2002, Scherer was moved from a single-cell in the RHU to a double-cell in the RHU, where he was celled with Joseph Monica.

40) Scherer was only allowed out of his RHU cell 3 ½ to 5 hours a week.

41) The size of the cell where Scherer was placed with Monica was essentially 7 feet by 9 feet with a little space at the door.

42) Dr. Husain observed the conditions of the RHU and was aware that [some of the] inmates were double celled in the RHU.

## 2.    **Analysis**

Husain has moved for dismissal of the ADA claim at Count II because of the fact that the ADA does not apply to individuals. Husain's Brief (Document No. 112), pp. 4-5. Plaintiff concedes he is not asserting such a claim against Husain. Plaintiff's Brief (Document No. 129), p. 1. Plaintiff is also not asserting an RA claim against Husain. *Id.* Plaintiff is only asserting his Eighth Amendment / § 1983 claim against Husain within his Amended Complaint. *Id.*

The Plaintiff argues that material issues of fact remain as to 1) Husain's prescription of Artane to the Decedent in light of his confinement in the RHU, 2) Husain's lack of credentials to practice psychiatry generally and specifically, psychiatry in prisons, 3) the failure to remove Husain from the RHU and SCI-Houtzdale completely in order to place him in an appropriate facility for mental health treatment, 4) the role of psychiatrists at SCI-Houtzdale according to the MSA, and "the ultimate issue regarding deliberate indifference". Plaintiff's Brief , pp. 9-12.

It is undisputed that Husain prescribed the Decedent Artane on August 2, 2002, that the Decedent was assigned to the RHU on August 2, 2002 having been transferred there after his release from the POC on July 30, 2002, that the Decedent was double-celled in the RHU with his assailant, Monica, that the Decedent while housed in the RHU, was within constrictive physical quarters and allowed out only at most five hours per week, but Husain is unable to "recall" if he met with the Decedent in the RHU. It is undisputed that Monica killed the Decedent on August 6, 2002, and that Husain had charted entries in the Decedent's medical records on July 27, 2002 and August 2, 2002. In light of these known facts, it remains disputed as to what extent Husain was aware of the Decedent's

cell situation, any observation of that situation, including the presence of Monica in the same cell with the Decedent, and the need for the Decedent's removal from the cell for placement into a mental health facility apart from SCI-Houtzdale and how the prescription of Artane would or would not affect the Decedent's behavior in this situation and if that prescription was proper under the circumstances. The presence of these disputed facts requires denial of the summary judgment motion because the Court cannot rule out the possibility that Husain "[knew] of and disregard[ed] an excessive risk to [the Decedent's] health or safety". *Id.*

The Plaintiff's presentation of disputed facts as to the submission of Husain's credentials to Wexford and the nature of the legal relationship between Khan and Husain appear to reflect upon the liability attached to Khan and Wexford in light of the alleged errors and omissions committed by Husain. As will be explained further, it is a disputed fact whether Husain had a duty under the MSA at all. Nevertheless, if Husain is alleged not to be qualified for the work he was performing because of a lack of training or experience, such a fact would support an argument that he was not deliberately indifferent because of his lack of awareness of risk to the Decedent's safety stemming from a lack of knowledge of prison operations or the practice of psychiatry in prisons generally. Furthermore, the "disagreement over whether Husain's credentials were ever submitted and reviewed by Wexford as required", Plaintiff's Brief, p. 9, is immaterial to Husain's alleged deliberate indifference. However, Husain's lack of qualifications would support an argument that Wexford or FCCG was deliberately indifferent in their hiring, training and/or supervision of Husain. Therefore, any issue of Husain's qualifications does not present a dispute of material fact as to a claim of deliberate indifference against Husain.

39

As to the Artane prescription, the Court finds that Husain's decision to place the Decedent on Artane does not legally, in itself, establish deliberate indifference; at most it might equate to medical negligence. However, coupled with the circumstances of his confinement and knowledge of the Decedent's medical history could establish the presence of deliberate indifference.

Finally, the role and responsibilities of psychiatrists at SCI-Houtzdale remains in dispute. The contractual agreements provided by the parties in the appendices to the motions for summary judgment present a contractual issue not addressed by the parties' arguments: incorporation by reference. FCCG's role in providing psychiatric services gradually expanded in the time leading up to the summer of 2002. The MSA was effective on June 1, 2002 and covered the Central Region of the Pennsylvania DOC, which included SCI-Houtzdale. See Document No. 154-3, p. 4. The MSA agreement was between DOC and Wexford. Wexford and FCCG previously entered into a "Independent Contractor Agreement" on October 30, 2000, which provided that FCCG would provide psychiatry services in furtherance of Wexford's then-existing contract with DOC only as to SCI-Camp Hill. Amendments to the October 2000 agreement were reached on February 23, 2001 and July 29, 2001. See Document No. 110-3, pp. 31-32. The July 29, 2001 amendment recognized that Khan may be asked to provide on-call services to sites other than SCI-Camp Hill. *Id.* at p. 32. FCCG and Wexford again amended their agreement on August 17, 2001 to officially add six new prisons for on-call service only, including SCI-Houtzdale while also providing FCCG the right to fill open position in the central Pennsylvania region. *Id.* p. 33. This third amendment was based upon Wexford's existing contract with DOC that was *limited* to SCI-Camp Hill. A fourth amendment, effective August 1, 2002, but signed by

40

Wexford's representative on January 20, 2003, provides for on-site coverage by FCCG for facilities in the western Pennsylvania region, and also SCI-Houtzdale. *Id.* at p. 34.

After reviewing these amendments and the MSA, the following issue is presented: How is the August 1, 2002 amendment to Wexford-FCCG contract, a contract that was originally dated October 20, 2000 and based upon a corrections contract between Wexford and DOC for SCI-Camp Hill (that has not been presented in the record) related to or incorporated into the MSA? Additionally, the MSA was not fully executed until May 29, 2002, almost ten months after the Decedent's death–therefore, there is an issue whether it is considered to be binding if not fully executed? It appears from this record that the "Corrections Contract" between Wexford and DOC, originally intended to relate only to SCI-Camp Hill would be the operative contract and the August 1, 2002 amendment to the Wexford-FCCG agreement would be the operative instrument that brings FCCG into its on-site responsibilities at SCI-Houtzdale.

To add to this confusion, the agreement between FCCG/Impartial Locum Tenens and Husain is a seven paragraph agreement signed and dated July 23, 2002 and no reference is made to the MSA, but only a brief reference is made to Wexford as the source of Khan's compensation and that Husain must "abide by DOC rules during work." Document No. 110-3, p. 36. Nowhere in that agreement is Husain put on notice of the MSA and its terms and even if he was, the record does not reflect that the MSA would apply to him or FCCG, the party with which he contracted. Additionally, on July 23, 2002, FCCG is only providing on-call services at SCI-Houtzdale under the terms of the August 17, 2001 amendment.

41

Finally, even if the MSA is applicable, the language invoked by the Plaintiff throughout his oppositions to the pending motions only refers to the fact that the psychiatrists "will also to make recommendations as to housing...as requested." There is no indication that DOC ceded or delegated power to the treating psychiatrists over the housing decisions of their patients or that DOC requested a housing recommendation from Husain. Nevertheless, with the contractual status of these parties' responsibilities in dispute, this fact helps Husain only if the MSA applies to him. Therefore, as to Husain's role in the placement of the Decedent in certain housing conditions, the contracts at issue present a disputed issue of fact. In light of these circumstances it is also clear that Husain and Khan's relationship remains in dispute.

In regard to the Plaintiff's expert, Dr. Gottlieb, and his opinion that deliberate indifference was exhibited by Husain through his actions or inactions recounted above, the Court finds that such an opinion based upon the expert's evaluation of the evidence and his resulting conclusions is appropriate for presentation to a jury so that the jurors can judge his credibility and his conclusions after hearing the facts presented at trial. Husain's motion for summary judgment is therefore denied as to all issues on the Plaintiff's Eighth Amendment / § 1983 claim, except as to the fact of his prescription of Artane to the Decedent standing alone, and as to the adequacy or inadequacy of his credentials to practice psychiatry generally or to specialize in psychiatry in a prison setting.

42

## D. Khan's Motion to Dismiss/Motion for Summary Judgment (Document No. 114)

### 1. Statements of Undisputed Material Fact

#### a. Khan's Statements Admitted to by Plaintiff

1) During the time period at issue, Mohammad K. Khan, M.D. provided psychiatric care and treatment to inmates at various DOC facilities pursuant to an ["Independent Contractor Agreement"] between Defendant Wexford Health Sources, Inc....and his group, Family Care Clinic Group & I.M.E., LLC a/k/a Family Care Clinic Group & Impartial Medical Examiners Corp. a/k/a Family Care Clinic Group & Impartial Medical Examiners a/k/a Impartial Locum Tenens....

2) FCCG is a privately owned, for-profit corporate entity that has been in existence since approximately January 2, 2001.

3) At all relevant times, FCCG was organized as a professional corporation ("PC") or limited liability corporation ("LLC"), and not a partnership or sole proprietorship.

4) Impartial Locum Tenens[, a part of the FCCG corporate organization,] was created on the advice of Dr. Khan's accountant so that locum tenens and full-time employees could be separately accounted for.

5) Pursuant to [the aforementioned "Independent Contractor Agreement"] with Wexford, which was amended several times, FCCG agreed to provide on-site and/or on-call psychiatric services at various DOC facilities, including SCI-Houtzdale.

9) On October 30, 2000, Wexford entered into an ["Independent Contractor Agreement"] with FCCG to provide on-site psychiatric care to inmates at SCI-Camp Hill for a minimum of 36 hours per week.

43

10) On August 17, 2001, the ["Independent Contractor Agreement"] was amended, with FCCG agreeing to provide on-call psychiatric services to inmates at a number of Pennsylvania correctional facilities, including SCI-Houtzdale.

11) Dr. Fisher, the full-time, resident psychiatrist at SCI-Houtzdale, left SCI-Houtzdale in late June of 2002.

12) FCCG, pursuant to its August 17, 2001 [amendment, provided] on-call psychiatric services [to inmates at SCI-Houtzdale because of] Dr. Fisher's departure....

13) On August 1, 2002, FCCG's ["Independent Contractor Agreement"] with Wexford was again amended, with FCCG agreeing to provide on-site psychiatric care at various facilities, including SCI-Houtzdale.

14) With respect to SCI-Houtzdale, the "Independent Contractor Agreement" amended on August 1, 2002 called for 35 hours of on-site psychiatric coverage per week.

15) FCCG was not compensated directly by the DOC; rather, the DOC paid Wexford, who in turn paid FCCG.

16) FCCG [paid] Dr. Husain....

17) Dr. Khan testified at his deposition that neither he nor FCCG accepted federal funding.

18) Plaintiff has not developed any evidence indicating that Dr. Khan or FCCG accepted federal funding of any kind.

19) Dr. Husain graduated from Chittagong Medical College in 1989.

20) Thereafter, he completed a one-year internship in general medicine and a one-year residency in internal medicine, both at Chittagong Medical College Hospital.

44

21) Dr. Husain then worked for two years in the Bangladesh health department as a family practitioner.

22) After coming to the United States in 1993 on a student visa, Dr. Husain passed the United States Medical Licensing Examination in 1994, worked for a time and then enrolled in a master's degree program in public health at the University of Alabama-Birmingham ("UAB") in 1996.

23) During his studies at UAB, Dr. Husain had the opportunity to shadow some practicing psychiatrists.

24) Thereafter, in 1998, Dr. Husain was accepted into UAB's psychiatric residency program, which he completed in 2002.

25) At the time that he entered into the independent subcontract with FCCG and was working at SCI-Houtzdale, Dr. Husain was a licensed psychiatrist.

31) On July 17, 2002, Dr. Khan assessed Decedent in a Psychiatric Observation Cell ("POC"), discontinued Decedent's lithium...and medically cleared Decedent for discharge from the POC pending approval by security.

32) Dr. Khan explained at his deposition that he medically cleared Decedent for discharge from the POC because it was his assessment that Decedent no longer needed "acute, inpatient care."

33) Following his discharge from the POC, Decedent was placed in a Special Needs Unit ("SNU") cell.

34) On July 22, 2002, Dr. Khan again assessed Decedent, and restarted Decedent on lithium given his agreement to take medications and expressed feeling that lithium helped with his mood and paranoia.

45

35) Dr. Khan also ordered the drug Seroquel and follow-up regarding lithium level, BUN, creatinine, thyroid stimulating hormone, CBC with differential....

37) Dr. Husain took over, from July 23, 2002 through August 27, 2002, the hours of psychiatric coverage at SCI-Houtzdale previously provided by Dr. Khan.

38) Dr. Khan played no part in the decision to place Decedent in the RHU following his misconduct....

39) Dr. Khan did not prescribe the Artane that Plaintiff claims was present in Decedent's bloodstream at "dangerously toxic levels" at the time of his death.

40) Decedent's Artane was discontinued on July 13, 2002 (prior to Dr. Khan's involvement) and was not re-started until August 2, 2002 (well after Dr. Khan's last involvement).

41) Dr. Husain worked 67 hours at SCI-Houtzdale between July 23, 2002 and July 31, 2002, and worked 8 hours on August 2, 2002, 10 hours on August 5, 2002 and 6 hours on August 6, 2002.

42) Dr. Husain reviewed Decedent's lab results on July 30, 2002 and determined that Decedent's lithium level was sub-therapeutic, but noted that Decedent had already been started on lithium.

43) On August 2, 2002, Dr. Husain ordered that Decedent be given the drug Artane (trihexyphenidyl).

44) Dr. Husain explained at his deposition that Artane is usually given to mentally ill patients to prevent extrapyramidal symptoms of antipsychotic medications.

45) Psychiatrists such as Dr. Khan and Dr. Husain saw inmates at a given DOC facility pursuant to a pre-established schedule developed by an on-site administrator/coordinator.

46

46) Day-to-day evaluation of mentally ill inmates was handled by the psychologists and counselors employed by the DOC.

48) When a mentally ill inmate (such as the Decedent) was released from the POC, he would be re-assigned to a particular prison unit not by the psychiatrist, but rather by the Program Review Committee consisting of the facility Deputy Superintendents.

51) Z-code status was generally determined by the Unit Manager, Counselor and RHU Officer, and then approved through the chain of command via a vote sheet.

52) Cell placements within the RHU were made by an RHU sergeant or lieutenant....

56) Plaintiff has submitted a report from psychiatrist Jerome I. Gottlieb, M.D., DFAPA.

### b. Plaintiff's Statements Admitted to by Khan

1) Wexford and DOC entered into a Comprehensive Medical Services Agreement ("MSA") effective June 1, 2002, which set forth the medical services, including psychiatric service Wexford agreed to provide to DOC facilities. The MSA covered SCI-Houtzdale.

13) Dr. Husain completed his residency program in psychiatry in June of 2002.

14) In the spring of 2002, Dr. Husain saw an advertisement [in *Psychiatric Times*] placed by Dr. Khan to work in Pennsylvania and contacted Dr. Khan.

17) Prior to seeing inmates at DOC facilities, Dr. Husain had only been in a correctional institution one time for half a day observing.

18) Prior to starting to work for...FCCG, Dr. Husain does not recall meeting with any representative from Wexford.

47

19) Prior to starting to work for...FCCG, Dr. Husain does not recall receiving any policies and procedures regarding caring for inmates with mental illness.

20) Prior to starting to work for...FCCG, Dr. Husain does not recall receiving any instructions about how frequently he should see inmates in the RHU.

21) Shortly after starting at [SCI-]Camp Hill, Dr. Khan asked Dr. Husain to move to [SCI-]Houtzdale.

24) On the day of Scherer's death (August 6, 2002), Dr. Husain was providing psychiatric services at [SCI-]Houtzdale.

25) On August 29, 2002, less than two months after being hired by FCCG...Dr. Husain quit and returned to Alabama.

31) Scherer was an individual who suffered from a...history of...mental illness. Scherer had been diagnosed with numerous mental illnesses, including schizophrenia, bipolar disorder and chronic paranoia.

32) Scherer suffered from...mental illness while housed at [SCI-]Houtzdale, which was well documented in the medical records at [SCI-]Houtzdale.

33) Dr. Husain reviewed Scherer's medical records as part of providing the psychiatric services and knew that he was suffering from mental illness.

34) Dr. Husain participated in psychiatric review team meetings.

36) Dr. Husain cannot recall if he saw Scherer in the RHU.

37) The medical records show that Dr. Husain made two entries in Scherer's medical records, one on July [30], 2002 and one on August 2, 2002.

38) On August 2, 2002, Dr. Husain ["continue[d] [Scherer on] Artane as ordered by Dr. Tomei on 6/21/2002."]

39) On July 30, 2002, Scherer was moved from a single-cell in the RHU to a double-cell in the RHU, where he was celled with Joseph Monica.

41) The size of the cell where Scherer was placed with Monica was essentially 7 feet by 9 feet with a little space at the door.

42) Dr. Husain observed the conditions of the RHU and was aware that inmates were double-celled in the RHU.

50) [FCCG] through its contract with Wexford was responsible for providing psychiatric services to inmates with mental illness at [SCI-]Houtzdale, including Scherer.

## 2. Analysis

Despite being responsible for a different period of treatment of the Decedent, Khan's arguments for summary judgment mimic Husain's arguments. *See* Khan's Brief (Document No. 108). The Plaintiff argues against summary judgment for Khan based upon the position that Khan "demonstrated a reckless disregard of a substantial risk to the safety and health of [the Decedent] in both his failure to train and supervise Dr. Husain and in the direct psychiatric services he provided to [the Decedent]." Plaintiff's Brief, (Document No. 130), pp. 2-3. Plaintiff concedes to the dismissal of the ADA and RA claims against Khan. Plaintiff's Brief, p. 1.

To the extent that the Plaintiff's claims against Khan are the same claims made against Husain for his failure to have the Decedent sent to another facility that could address his mental health issues, Khan's motion for summary judgment is denied. Therefore, the Plaintiff's claims as to the failure of

49

Khan to place the Decedent in a facility outside of [SCI-]Houtzdale remain. It is undisputed that Khan was the Decedent's treating physician until July 26, 2002, that Khan previously discharged him from the POC on July 17, 2002 and that the Decedent was discontinued from his Artane prior to Khan's treatment of the Decedent, but that Artane was subsequently continued by Husain. Therefore, no claims involving the prescription of Artane can be made against Khan. The Court also finds no viable Eighth Amendment Claim for deliberate indifference against Khan individually for allegedly failing to forward Husain's credentials to Wexford.

Khan's alleged failure to train and supervise Husain presents a more complex issue of liability as to Khan. It remains in dispute whether Kahn and Husain had an employer-employee relationship or a contractor-subcontractor relationship. The agreement between the two doctors is noticeably more terse than one would expect where the agreement concerns the assumption of responsibilities to provide psychiatric care for potentially hundreds of incarcerated prisoners. However, the legal effect of this document and the documents exchanged between FCCG and Wexford also present further questions as to the roles played by and the responsibilities imposed upon the medical professionals in the case *sub judice* in relation to their liability pursuant to 42 U.S.C. § 1983. Despite the lack of clarity as to the applicability of the contractual agreements in this matter as well as the nature of the relationship between Khan and Husain, for the following reasons summary judgment must be denied as to the Plaintiff's failure to train and supervise claim made against Khan.

For a plaintiff in a civil rights action to establish liability against a defendant, the plaintiff must prove the defendant's "personal involvement in the alleged wrongs." *Rode v. Dellaciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Assuming Khan is acting under color of law, he can be liable for a

violation of Scherer's Eighth Amendment rights under § 1983 if he has "exhibited deliberate indifference to the plight of [Scherer]." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)(citation omitted). While it is axiomatic to state that § 1983 liability cannot be imposed through a theory of *respondeat superior*, *see Monell v. Dept. of Soc. Sers. Of New York City*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 636 (1978), supervisory liability may be imposed against Khan if it is proven that he supervised Husain,[9] and then either 1) he directed Husain take unconstitutional action, or 2) knew of Husain's unconstitutional actions and acquiesced in them, *Dellaciprete* at 1207, or 3) Khan had a policymaking power over Husain, and failed to train or supervise Husain. *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005); *Montgomery v. DeSimone*, 159 F.3d 120, 126-127 (3d Cir. 1998).

The Plaintiff presents his claim in terms of Husain being an inexperienced psychiatrist with a negligible amount of experience in treating inmates of a correctional facility and who was otherwise left to his devices by Khan who failed to present any training, guidelines or direction as to how Husain should perform his duties at Houtzdale. *See* Plaintiff's Brief, p. 3. The facts may also demonstrate that any actions Kahn took with respect to Husain were always done on behalf of FCCG even if there was a supervisory relationship between Husain and Khan. While the facts may or may not support a supervisory relationship between Khan and Husain,[10] there are sufficient facts in dispute as to Khan's

---

[9]Liability may be imposed for a non-supervisory employee's failure to intervene on behalf of a victim of a civil rights violation, but such liability has only been imposed by the Third Circuit in matters concerning correctional officers and police officers, and in the absence of precedent establishing a broader swath of state officials liable under this theory, this Court will not venture to posit an extension of it to Khan in the event he is found not to be Husain's supervisor. *See Smith v. Mensinger*, 293 F.3d 641, 650-652 (3d Cir. 2002).

[10]If Khan is found to be a supervisor, these issues may concern FCCG or even Wexford depending upon how the disputed facts concerning the contractual relationship are interpreted by a jury.

51

actions or inactions with respect to Husain if it is assumed that Khan did supervise Husain. Khan's motion is denied as to the Plaintiff's claims of Khan's failure to train and supervise Husain.

## E. FCCG's Motion to Dismiss Plaintiff's Amended Complaint, or in the alternative Motion for Summary Judgment (Document No. 125)

### 1. Statements of Material Fact

#### a. FCCG's Statements Admitted to by Plaintiff

1) During the time period at issue, Mohammad K. Khan, M.D. provided psychiatric care and treatment to inmates at various DOC facilities pursuant to an ["Independent Contractor Agreement"] between Defendant Wexford Health Sources, Inc....and his group, Family Care Clinic Group & I.M.E., LLC a/k/a Family Care Clinic Group & Impartial Medical Examiners Corp. a/k/a Family Care Clinic Group & Impartial Medical Examiners a/k/a Impartial Locum Tenens....

2) FCCG is a privately owned, for-profit corporate entity that has been in existence since approximately January 2, 2001.

3) At all relevant times, FCCG was organized as a professional corporation ("PC") or limited liability corporation ("LLC"), and not a partnership or sole proprietorship.

4) Impartial Locum Tenens[, a part of the FCCG corporate organization,] was created on the advice of Dr. Khan's accountant so that locum tenens and full-time employees could be separately accounted for.

5) Pursuant to the aforementioned independent subcontract with Wexford, which was amended several times, FCCG agreed to provide on-site and/or on-call psychiatric services at various DOC facilities, including SCI-Houtzdale.

52

9) On October 30, 2000, Wexford entered into an ["Independent Contractor Agreement"] with FCCG to provide on-site psychiatric care to inmates at SCI-Camp Hill for a minimum of 36 hours per week.

10) On August 17, 2001, the ["Independent Contractor Agreement"] was amended, with FCCG agreeing to provide on-call psychiatric services to inmates at a number of Pennsylvania correctional facilities, including SCI-Houtzdale.

11) Dr. Fisher, the full-time, resident psychiatrist at SCI-Houtzdale, left SCI-Houtzdale in late June of 2002.

12) FCCG, pursuant to its August 17, 2001 [amendment provided] for on-call psychiatric services, [to inmates at SCI-Houtzdale following] Dr. Fisher's departure....

13) On August 1, 2002, FCCG's ["Independent Contractor Agreement"] with Wexford was again amended, with FCCG agreeing to provide on-site psychiatric care at various facilities, including SCI-Houtzdale.

14) With respect to SCI-Houtzdale, the ["Independent Contractor Agreement" was] amended on August 1, 2002 called for 35 hours of on-site psychiatric coverage per week.

15) FCCG was not compensated directly by the DOC; rather, the DOC paid Wexford, who in turn paid FCCG.

16) FCCG [paid] Dr. Husain....

17) Dr. Khan testified at his deposition that neither he nor FCCG accepted federal funding.

18) Plaintiff has not developed any evidence indicating that Dr. Khan or FCCG accepted federal funding of any kind.

19) Dr. Husain graduated from Chittagong Medical College in 1989.

20) Thereafter, he completed a one-year internship in general medicine and a one-year residency in internal medicine, both at Chittagong Medical College Hospital.

21) Dr. Husain then worked for two years in the Bangladesh health department as a family practitioner.

22) After coming to the United States in 1993 on a student visa, Dr. Husain passed the United States Medical Licensing Examination in 1994, worked for a time and then enrolled in a master's degree program in public health at the University of Alabama-Birmingham ("UAB") in 1996.

23) During his studies at UAB, Dr. Husain had the opportunity to shadow some practicing psychiatrists.

24) Thereafter, in 1998, Dr. Husain was accepted into UAB's psychiatric residency program, which he completed in 2002.

25) At the time that he entered into the independent subcontract with FCCG and was working at SCI-Houtzdale, Dr. Husain was a licensed psychiatrist.

31) On July 17, 2002, Dr. Khan assessed Decedent in a Psychiatric Observation Cell ("POC"), discontinued Decedent's lithium...and medically cleared Decedent for discharge from the POC pending approval by security.

32) Dr. Khan explained at his deposition that he medically cleared Decedent for discharge from the POC because it was his assessment that Decedent no longer needed "acute, inpatient care."

33) Following his discharge from the POC, Decedent was placed in a Special Needs Unit ("SNU") cell.

34) On July 22, 2002, Dr. Khan again assessed Decedent, and restarted Decedent on lithium given his agreement to take medications and expressed feeling that lithium helped with his mood and paranoia.

35) Dr. Khan also ordered the drug Seroquel and follow-up regarding lithium level, BUN, creatinine, thyroid stimulating hormone, CBC with differential....

37) Dr. Husain took over, from July 23, 2002 through August 27, 2002, the hours of psychiatric coverage at SCI-Houtzdale previously provided by Dr. Khan.

38) Dr. Khan played no part in the decision to place Decedent in the RHU following his misconduct....

39) Dr. Khan did not prescribe the Artane that Plaintiff claims was present in Decedent's bloodstream at "dangerously toxic levels" at the time of his death.

40) Decedent's Artane was discontinued on July 13, 2002 (prior to Dr. Khan's involvement) and was not re-started until August 2, 2002 (well after Dr. Khan's last involvement).

41) Dr. Husain worked 67 hours at SCI-Houtzdale between July 23, 2002 and July 31, 2002, and worked 8 hours on August 2, 2002, 10 hours on August 5, 2002 and 6 hours on August 6, 2002.

42) Dr. Husain reviewed Decedent's lab results on July 30, 2002 and determined that Decedent's lithium level was sub-therapeutic, but noted that Decedent had already been started on lithium.

43) On August 2, 2002, Dr. Husain ordered that Decedent be given the drug Artane (trihexyphenidyl).

44) Dr. Husain explained at his deposition that Artane is usually given to mentally ill patients to prevent extrapyramidal symptoms of antipsychotic medications.

45) Psychiatrists such as Dr. Khan and Dr. Husain saw inmates at a given DOC facility pursuant to a pre-established schedule developed by an on-site administrator/coordinator.

46) Day-to-day evaluation of mentally ill inmates was handled by the psychologists and counselors employed by the DOC.

48) When a mentally ill inmate (such as the Decedent) was released from the POC, he would be re-assigned to a particular prison unit not by the psychiatrist, but rather by the Program Review Committee consisting of the facility Deputy Superintendents.

51) Z-code status was generally determined by the Unit Manager, Counselor and RHU Officer, and then approved through the chain of command via a vote sheet.

52) Cell placements within the RHU were made by an RHU sergeant or lieutenant....

56) Plaintiff has submitted a report from psychiatrist Jerome I. Gottlieb, M.D., DFAPA.

### b. Plaintiff's Statements Admitted to by FCCG

1) Wexford and DOC entered into a Comprehensive Medical Services Agreement ("MSA") effective June 1, 2002, which set forth the medical services, including psychiatric service Wexford agreed to provide to DOC facilities. The MSA covered SCI-Houtzdale.

13) Dr. Husain completed his residency program in psychiatry in June of 2002.

14) In the spring of 2002, Dr. Husain saw an advertisement [in *Psychiatric Times*] placed by Dr. Khan to work in Pennsylvania and contacted Dr. Khan.

56

17) Prior to seeing inmates at DOC facilities, Dr. Husain had only been in a correctional institution one time for half a day observing.

18) Prior to starting to work for...FCCG, Dr. Husain does not recall meeting with any representative from Wexford.

19) Prior to starting to work for...FCCG, Dr. Husain does not recall receiving any policies and procedures regarding caring for inmates with mental illness.

20) Prior to starting to work for...FCCG, Dr. Husain does not recall receiving any instructions about how frequently he should see inmates in the RHU.

21) Shortly after starting at [SCI-]Camp Hill, Dr. Khan asked Dr. Husain to move to [SCI-]Houtzdale

24) On the day of Scherer's death (August 6, 2002), Dr. Husain was providing psychiatric services at [SCI-]Houtzdale.

25) On August 29, 2002, less than two months after being hired by FCCG...Dr. Husain quit and returned to Alabama.

31) Scherer was an individual who suffered from a...history of...mental illness. Scherer had been diagnosed with numerous mental illnesses, including schizophrenia, bipolar disorder and chronic paranoia.

32) Scherer suffered from...mental illness while housed at Houtzdale, which was well documented in the medical records at [SCI-]Houtzdale.

33) Dr. Husain reviewed Scherer's medical records as part of providing the psychiatric services and knew that he was suffering from mental illness.

57

34) Dr. Husain participated in psychiatric review team meetings.

36) Dr. Husain cannot recall if he saw Scherer in the RHU.

37) The medical records show that Dr. Husain made two entries in Scherer's medical records, one on July [30], 2002 and one on August 2, 2002.

38) On August 2, 2002, Dr. Husain ["continue[d] [Scherer on] Artane as ordered by Dr. Tomei on 6/21/2002."]

39) On July 30, 2002, Scherer was moved from a single-cell in the RHU to a double-cell in the RHU, where he was celled with Joseph Monica.

41) The size of the cell where Scherer was placed with Monica was essentially 7 feet by 9 feet with a little space at the door.

42) Dr. Husain observed the conditions of the RHU and was aware that inmates were double-celled in the RHU.

50) [FCCG] through its contract with Wexford was responsible for providing psychiatric services to inmates with mental illness at [SCI-]Houtzdale, including Scherer.

52) Dr. Khan [was the] decision-maker [for] FCCG [from 2001 through 2002.]

61) After a few weeks at Houtzdale, Dr. Husain decided to resign and returned to Alabama.

63) The Chief Psychologist at SCI-Houtzdale stated that there always had been difficulty in having consistent psychiatric services because many psychiatrists would come and go, some for as little as a day.

65) The concerns with consistent psychiatric coverage were known to Deputy for Centralized Services, George Patrick.

58

## 2. **Analysis**

The Plaintiff presents an ADA claim and an Eighth Amendment / § 1983 claim against FCCG in his Amended Complaint. No RA claim is made against FCCG in the Amended Complaint. *See* Memorandum Order (Document No. 100), p. 3. The Court addresses FCCG's arguments as to the ADA and § 1983 claims in turn.

**a**

Title II of the ADA prohibits discrimination against disabled individuals and reads in pertinent part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The present issue is whether FCCG is a "public entity" as defined within the ADA, thus requiring it to comply with that statute. FCCG cites many cases[11] in an attempt to show that it is not a "public entity" under Title II of the ADA. FCCG's Brief, pp. 14-18. FCCG claims that because it is not a "public entity" that FCCG should be granted summary judgment on the Plaintiff's ADA claim. *Id.* Despite FCCG's arguments regarding the conversation of private entities into "public entities" after receipt of federal funding, the Court finds a more fundamental issue with regard to the language of the ADA is dispositive of the motion.

---

[11]*See e.g.,Schiavo v. Schiavo*, 403 F.3d 1289 (11th Cir. 2005) (hospice not a "public entity" despite its receiving Medicare and Medicaid payments); *Chatoff v. West Publishing Co.,* 948 F.Supp. 176, 179 (E.D.N.Y. 1996) (West Publishing Company was not a "public entity" despite having substantial contracts with the Federal Government); *Ellis v. Morehouse School of Medicine*, 925 F.Supp. 1529 (N.D.Ga. 1996) (private medical school not a "public entity").

"Public entity" is defined as "(A) any state or local government; (B) any department, agency, special purpose district or other instrumentality of a State or states or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49)." 42 U.S.C. § 12131(1).

There is a dearth of case law regarding what non-governmental or otherwise corporate bodies or individuals qualify as a "public entity" under Title II of the ADA. However, a review of the limited caselaw and the law of the case reveals the answer.

FCCG is a corporation and the language of the statute would seemingly exclude it under its terms unless it was an "instrumentality of a State...or local government." The Court of Appeals for the Second Circuit addressed this issue with respect to a private hospital. In *Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006), the Second Circuit determined that a hospital, whose personnel responded to a 911 call, could not be liable under the ADA because it was not a "public entity" despite the argument of the plaintiffs that "[i]t carried out a public function pursuant to a contract with the City, in accord with City rules, and under the direction of City employees." *Green* at 78. Concluding that the language of the ADA was clear, the Second Circuit determined that St Luke's, the private hospital in question, could not qualify as any of the variants listed under the "public entity" definition save for an "instrumentality." *Green* at 78-79. Concluding that an "instrumentality" as used within the ADA equates with "a creature of a state or municipality", the Second Circuit dismissed the plaintiffs' ADA claim against St. Luke's Hospital. *Green* at 79.

In the case *sub judice*, this Court previously ruled that former defendant Dr. Jeffrey Pomerantz and Dr. Khan were not "public entities" when sued in their individual capacities. *See* Memorandum

60

Opinion and Order of Court dated May 9, 2005 (Document No. 41). In that opinion, we concluded that the word "instrumentality" as used in that statutory definition of "public entity" did not include "persons" or "individuals." *Id.* at p. 8.

Now in viewing the Plaintiff's ADA claim against FCCG, this Court once again concludes that FCCG, in light of its contract with Wexford to provide psychiatric care in certain DOC facilities, is not converted into a "public entity" as defined by the ADA. The Plaintiff argues that the services provided by FCCG in DOC facilities "are clearly services of a public entity" despite being provided by a third party. Plaintiff's Brief (Document No. 140), pp. 9-10. While it is true that inmates, confined to a DOC facility, have no other choice but to receive psychiatric care from the private contractor present in those institutions, and such institutions have a constitutional duty to provide such medical care, *see id.,* the language of the ADA is clear. The Court cannot read into the clear statutory language matters that would be inconsistent with such language. While it might appear that a state or local government can avoid all obligations under the ADA by contracting for such services with private individuals and other entities, such an issue is a matter of policy that is not properly considered in engaging in statutory construction of otherwise clear statutory language. Consistent with *Green* and our analysis previously rendered in this matter as to Dr. Pomerantz and Dr. Khan, FCCG is a privately owned corporation. In no way is it a state or local government or a special purpose district or a department, agency, or instrumentality of such a government and it clearly is not the National Railroad Passenger Corporation or otherwise providing commuter services. FCCG's motion for summary judgment is granted as to the Plaintiff's ADA claim against it.

**b**

Turning to the Plaintiff's § 1983 claim against FCCG, FCCG argues that it should be awarded dismissal of this claim pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively, summary judgment for the lack of dispute as to material facts that demonstrate FCCG did not violate the Decedent's Eighth Amendment rights. FCCG's Brief, pp. 18-24. However, the Plaintiff views the FCCG's liability under the Eighth Amendment as being established or otherwise remaining in dispute based upon three theories: 1) FCCG was directly involved in the violations of [the Decedent's rights] by failing ...to train and supervise Dr. Husain...."; 2) "FCCG had a formal policy as well as a practiced custom of placing short-term psychiatrists in correctional facilities who were unprepared to provide mental health services to inmates-a policy and custom that was a moving force behind the violation of Scherer's Eighth Amendment rights."; and 3) "FCCG failed to provide Scherer with adequate medical care." Plaintiff's Brief, pp. 13, 19, 23. The Court considers here the Plaintiff's first theory.

> In order to state a viable § 1983 claim, a plaintiff must allege that the conduct complained of was committed by a person acting under color of state law and that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or by laws of the United States. A defendant's conduct must have a close causal connection to plaintiff's injury in order for § 1983 liability to attach. A prerequisite for a viable civil rights claim is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. Liability may not be imposed under § 1983 on the principle of *respondeat superior*. A private doctor who provides medical services to inmates pursuant to a contract with the prison may be held liable in a civil rights suit. Absent a showing that an employee committed the alleged unlawful act(s) at issue pursuant to a policy of her or his private corporate employer, said employer cannot be held vicariously liable for its employee's purported misdeed(s) in a civil rights suit.

*Hetzel v. Swartz,* 909 F.Supp. 261, 263-264 (M.D.Pa.,1995)(internal citations and citations omitted).

The Supreme Court has recognized a cause of action for failure to train employees under § 1983 where

62

liability attaches only after a showing that the failure to train amounted to a "deliberate indifference to the rights of [others]." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 427 (1989). This "deliberate indifference" standard is an objective standard different than the subjective deliberate indifference standard that is applied with "serious medical needs" under the Eighth Amendment, *see Farmer v. Brennan*, 511 U.S. 825, 840-847, 114 S.Ct. 1970, 1980-1984, 128 L.Ed.2d 811, 827-832 (1994). *Canton* teaches that the failure to train an employee must be a choice on the part of the supervisor or supervising entity knowing that the training that is (or is not) being provided is not sufficient for the employees and the choices they encounter on the job. *Canton* at 388-390, 109 S.Ct. 1197, 1204-1206, 103 L.Ed.2d 412, 426-428.

The Third Circuit has recognized that the failure to supervise encompasses the failure to train and supervisors, whether natural persons or municipalities, are liable for the failure to train when they possess "deliberate indifference" to others' rights, creating the "'moving force [behind] the constitutional violation' of a subordinate". *Sample v. Diecks*, 885 F.2d 1099, 1116-1118 (3d Cir. 1989)(citations omitted).

It has been established that physicians providing treatment to inmates in a correctional institution is in fact state action for purposes of § 1983. *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40, 53 (1988). In observing FCCG's role in the instant case, as a medical contractor, the Court sees no difference between a coporate entity contracted to provide medical care in a correctional institution as opposed to an individual physician. Thus, the Court finds that FCCG is a state actor. The next question is whether FCCG has violated the Decedent's Eighth Amendment rights.

63

The Plaintiff posits the theory that FCCG, as supervisor of Husain, is liable under § 1983 in its failure to train and supervise him pursuant to *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999). In *Carter*, the Third Circuit followed a three prong test for evaluating § 1983 claims for deliberate indifference arising from the "failure to train or supervise: (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)(citation omitted)(footnote omitted).

Without pouring through the many disputed facts in issue, the Court recognizes that the undisputed facts do not support summary judgment for FCCG on a failure to train or supervise Husain. It was known 1) that the DOC had difficulty retaining psychiatrists for inmate care, 2) that Khan, as FCCG's principal, established a system for short-term employment of psychiatrists like Husain to perform such care, 3) that Khan himself provided care to the Decedent and thus was aware of his conditions, 4) that Khan on behalf of FCCG re-assigned Husain to SCI-Houtzdale and was aware of the limited experience of Husain in treatment of inmates in a correctional facility, and 5) that the incorrect treatment or prescription of medication could result in deliberate indifference to the Decedent's rights. FCCG has not established that the record is undisputed for purposes of the Plaintiff's claim that FCCG failed to train or supervise Husain.

c

Moving on to the policy or custom theory of liability argued by the Plaintiff as to FCCG, the facts on this issue remain in dispute as well. FCCG did in fact establish a division or component of itself to allow for the accounting of short-term psychiatrists employed with it. The Plaintiff argues that FCCG practice of employing psychiatrists for short-term periods of time and placing them in a correctional institution to provide psychiatric treatment of inmates without training specific to such circumstances and continued supervision of their work resulted in FCCG's deliberate indifference to the Decedent's "serious medical needs." Plaintiff's Brief, p. 22. The Court agrees that the disputed facts could support this theory of liability against FCCG.

The Third Circuit has found that:

A city may be held liable for an official policy or a custom which proximately causes a constitutional deprivation. A single incident violating a constitutional right done by a governmental agency's highest policymaker for the activity in question may suffice to establish an official policy. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (county attorney's decision to have sheriffs enter premises established official policy). A single incident by a lower level employee acting under color of law, however, does not suffice to establish either an official policy or a custom. However, if custom can be established by other means, a single application of the custom suffices to establish that it was done pursuant to official policy and thus to establish the agency's liability. *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Custom may be established by proof of knowledge and acquiescence. *See Pembaur v. Cincinnati,* 475 U.S. at 481-82 n. 10, 106 S.Ct. at 1299 n. 10, 89 L.Ed.2d at 473 n. 10.

*Fletcher v. O'Donnell*, 867 F.2d 791, 793 -794 (3d Cir. 1989). It is undisputed that Husain does not recall if he met "with any representative from Wexford", "receiv[ed] any policies or procedures regarding caring for inmates with mental illness" or "receiv[ed] any instructions about how frequently

65

he should see inmates in the RHU." *Supra,* p. 57. It remains disputed whether Husain was "properly trained...for providing psychiatric services to inmates with severe mental illness housed in the RHU." *See* Plaintiff's Response (Document No. 139), Counterstatement No. 30. If the Decedent's death is attributed to a single failure of an individual who is a "lower level employee", it would appear that such evidence could not establish a policy or custom. However, if a failure of that individual resulting in a violation of the Decedent's Eighth Amendment rights is a result of the implementation of a policy or custom by the policymaker, such as FCCG, FCCG could be liable under § 1983 for that illegal policy or custom. The Plaintiff presents this theory through two views: first, the program of providing short-term psychiatrists caused problems with the continuity of providing care and evaluation of medications of SCI-Houtzdale inmates and second, the lack of a policy regarding training and supervision of Impartial Locum Tenens psychiatrists, which in essence was a *de facto* policy of no training or supervision, despite the fact that the circumstances of prisoners' psychiatric involvement provide the potential for Eighth Amendment violations in the absence of necessary training for these treating psychiatrists.

The first view fails under a policy or custom argument based upon the undisputed facts of this case. The only Impartial Locum Tenens psychiatrist to treat the Decedent was Husain. Prior to his care, Khan provided the Decedent care. Khan provided his care not as a part of the Impartial Locum Tenens division, but as FCCG generally. The change in physicians results not from the constant turn-over of Impartial Locum Tenens psychiatrists but an assignment by FCCG of a caseload at SCI-Houtzdale to Husain, as an employee classified as an Impartial Locum Tenens. Moreover, the facts reveal that FCCG provided psychiatric care after the departure of Dr. Fisher, a DOC psychiatrist. At

66

the time of Dr. Fisher's departure, FCCG was only providing on-call care at SCI-Houtzdale, which later became on-site care as of August, 1, 2002. As of that date, Husain was providing care for the Decedent. The only treatment from FCCG to the Decedent was provided by Khan and Husain, with Husain being assigned after a decision by Khan, not because of a previous departure of any Impartial Locum Tenens physician. Husain remained working at SCI-Houtzdale for three weeks after the Decedent's death. Therefore, it is undisputable that the policy of providing short-term physicians is not the cause of any harm to the Decedent. Summary judgment must be granted on this view of the custom/policy liability under 42 U.S.C. § 1983.

The second view does present merit. The undisputed evidence supports the idea that Husain may not have been trained concerning the intricacies of proving psychiatric treatment within correctional facilities. The disputed facts also leave unresolved the issue of training and supervision that may have existed for Husain. The absence of training and supervising psychiatrists regarding the circumstances germane to treatment of prisoners could present a case for liability in the face of situations that can reoccur, including housing assignments, inmate overcrowding, the prescription of medication that may have adverse effects specific to inmate populations in light of the their living arrangements and also the effects such arrangements may have upon any recovery or continued health. Since the absence of training or supervision may be the result of a policy or custom followed by FCCG, summary judgment is denied as to this view of the policy/custom liability under a § 1983 claim.

**d**

Finally, in response to FCCG's argument that it was not responsible for levels of staffing of physicians or inmate housing and disciplinary matters, the Plaintiff argues that "FCCG failed to provide Scherer with adequate medical care." Plaintiff's Brief, p. 23. Specifically, the Plaintiff alleges a lack of following through with "ensur[ing] the safety and well-being of mentally ill inmates" pursuant to the contract between Wexford and DOC. *Id.* The Plaintiff also states that "[b]y not providing Carl Scherer with adequate medical personnel, FCCG exposed Carl Scherer to a substantial risk to his safety and health." *Id.* The Plaintiff cites the cases of *Carty v. Farrelly,* 957 F.Supp. 727, 737 (D.V.I. 1997) and *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) in support of this argument.

First, the court refers back to the discussion regarding the incorporation of the Wexford-FCCG "Corrections Contract" and its amendments under the analysis of Husain's motion. *Supra* pp.40-42. The various amendments between Wexford and FCCG are amendments to the October 30, 2000 Independent Contractor Agreement Wexford entered into with FCCG to provide subcontracted services for Wexford's "Corrections Contract" with DOC as to SCI-Camp Hill only. However, it does not appear that the MSA was incorporated into the August 1, 2002 amendment. This is crucial to the Plaintiff's claim of denial of adequate medical care as to FCCG because the MSA is the basis of the Plaintiff's claim. As for the "Corrections Contract" which apparently was the basis of the August 1, 2002 amendment between FCCG and Wexford, it was terminated in 2000 or 2001:

68

Q:   Okay. My understanding was that Wexford had a contract for the central region of the state and then I think in 2002–

A:   Right.

Q:   –it was awarded the contract for the whole state?

A;   Right.

***

Q:   –I'm referring to Wexford. When Wexford was awarded the contract for the entire state, did that essentially supersede the contract you had for the central region?

A:   Yes. That contract had actually expired, I believe, in 2000 or 2001.

Q:   All right.

A:   The central contract.

Q:   And do you know if Wexford had continued to provide services for the central region or was another provider in there between the expiration of the central contract and the execution–

A:   No.

Q;   –of the statewide?

A:   We continued to provide services and the other two were added.

69

Deposition of Jimmy Webster, Representative of Wexford, Khan's Appendix (Document No. 110-6), Exhibit D, pp. 14-15.

However, the final amendment to the "Independent Contractor Agreement," an agreement which appears from the record to be based upon the apparently expired "Corrections Contract", is the August 1, 2002 amendment between FCCG and Wexford. Khan's Appendix (Document No. 110-3), Exhibit A, pp. 19-36. This amendment to section "II. 2. Terms of Agreement" of the October 30, 2000 "Independent Subcontractor Agreement" recorded FCCG's stipulation to provide on-site coverage at SCI-Houtzdale among other correctional facilities. *Id.* The MSA was effective June 1, 2002, but the only document executed by FCCG and Wexford at that time or subsequent to that date was the August 1, 2002 amendment and it does not appear to incorporate the MSA. In light of these legal issues, the Court could not accept the proposed undisputed material facts on these points. Therefore, the Court cannot conclusively find that the Decedent was or was not provided with adequate medical care if the basis for that claim is the fact that FCCG is bound by the MSA. There is also not sufficient undisputed factual evidence regarding the levels of staffing and the roles played by the various staff at SCI-Houtzdale that could conclusively establish the existence or non-existence of liability for any party on the Plaintiff's claim of the absence of adequate medical care provided to the Decedent. Summary judgment is denied as to this argument.

70

**F.     Wexford's Motion for Summary Judgment (Document No. 135)**

      **1.     Statements of Fact**

          **a.     Wexford's Statements Admitted to by Plaintiff**

1) Wexford was in the business of providing medical services to prisons, jails, and juvenile detention centers.

2) Wexford provided psychiatric services at the Pennsylvania [DOC] facilities pursuant to a contract with the Pennsylvania [DOC].

3) Wexford did not receive any federal funds from 2000 to 2002.

4) Wexford did not provide services to any individuals that may have been reimbursed through Medicare or Medicaid.

5) Neither Dr. Khan, nor his group FCCG, received any federal funding.

6) Plaintiff has not developed any evidence indicating that Wexford accepted federal funding of any kind.

10) Dr. Khan and his group, Family Care Clinic & IME L.L.C. (FCCG) provided psychiatric care and treatment at various DOC facilities pursuant to a subcontract between Wexford and FCCG.

15) The psychiatrists saw inmates at a given DOC facility pursuant to a pre-established schedule developed by an on-site administrator/coordinator.

17) Day-to-day evaluation of mentally ill inmates was handled by the psychologists and counselors employed by the DOC.

19) Mr. Scherer was placed in the special needs Unit (SNU) due to his mental illness.

20) The Special Needs Unit (SNU) is a small unit within an institution for inmates with mental, physical or social problems who are felt will have difficulty surviving in the general population, which provides additional protection and care.

29) An inmate could be placed in the RHU for disciplinary reasons or administrative reasons.

36) When an inmate is placed in the RHU, medications they have in their cell are confiscated and delivered to the medical department.

37) When an inmate is placed in the RHU, the RHU staff notifies the DOC's nursing supervisor to ensure that the inmate receives his medication while in the RHU.

39) The DOC Program Committee reviews each inmate in the RHU every 90 days to determine if the inmate should be released from the RHU prior to the expiration of the misconduct.

40) Mr. Scherer had a history of psychiatric and behavioral problems, with diagnoses of schizophrenia, borderline personality [sic], poly-substance dependence, antisocial personality disorder, bipolar disorder and schizoaffective disorder.

41) Mr. Scherer had been granted parole but it was withdrawn when the DOC revoked its parole support.

43) Dr. Khan saw Mr. Scherer on July 16, 2002 at which time he discontinued Mr. Scherer's Lithium, Seroquel and Artane prescriptions and discharged him from the POC to the block if agreed to by Security.

47) On July 17, 2002, Mr. Scherer refused a blood draw to test his lithium levels.

48) Mr. Scherer was placed in the RHU on a pre-hearing basis on July 26, 2002 for threatening another inmate.

49) Mr. Scherer's disciplinary hearing was held on July 29, 2002, after which he was found guilty of threatening another inmate.

50) The physical altercation between Mr. Scherer and his cellmate, Mr. Monica, which led to Mr. Scherer's death arose [after] a dispute about a breakfast tray.

### b. Plaintiff's Statements Admitted to by Wexford

Wexford has not replied to Plaintiff's Statement of Material Facts. All of the following facts are admitted as unopposed in accordance with Local Rule 56.1 E. However, the operation of Local Rule 56.1 E. does not operate to make the Plaintiff's proposed statements material or supported in the record when they are not material or located within the record. For these reasons, not all of the Plaintiff's proposed statements are included in this section.

1) Wexford and DOC entered into a Comprehensive Medical services Agreement("MSA"), which set forth the medical services, including psychiatric services, Wexford agreed to provide to DOC facilities. The MSA covers SCI-Houtzdale.

2) The psychiatric services to be provided under the MSA are set forth in Attachment Two dated April 10, 2001. Excerpts are included with Exhibit A.

73

3) Section 2.26 specifically sets forth the Psychiatric Services Wexford was to provide to inmates at SCI-Houtzdale from June 1, 2002 until the time of Scherer's death.

4) Section 2.26.1 sets forth mental health programs and services that are to be provided as part of the MSA.

5) Section 2.27 states that "Wexford will ensure that all inmates have access to mental health services at a quality level comparable to that available in the community and in accordance" with numerous standards and policies.

6) Section 2.27 states that the mental health services will include, *inter alia*, 1) Psychiatric Assessment, Evaluation and Diagnosis; 6) Multidisciplinary Treatment Planning & Psychiatric Review Team; 8) Individual and Group Interventions; 10)**Evaluation of inmates housed in administrative or disciplinary confinement, or Protective / Close Management.** (emphasis added).

7) Section 2.27.12 states the following:

Wexford psychiatrists will provide evaluation and treatment for inmates placed in psychiatric observation cells, special needs units and **restrictive housing units**. Inmates in psychiatric observation cells and the special observation unit will be assessed daily or more often if clinically indicated. **Psychiatrists will assess inmates with serious mental illness in the restricted housing unit weekly** and evaluate inmates in the special needs units every thirty days or as according to Department Policy.

Weekly rounds will be completed, or more frequently if needed, **in the restrictive housing units** and special needs unit to interview and observe inmates with mental illness. According to Department policy, the psychiatrist will make the appropriate documentation for each inmate served, and note any significant changes, mental status, plans for continued treatment and recommendations.

74

**Wexford staff will assist the staff in these units with strategies to interact with identified inmates that will significantly decrease the chances of the inmate decompensating.**

(emphasis added).

8) Sections 2.27.15 and 2.27.16 provide that psychiatrists will participate in a Psychiatric Review Team and that **"Wexford staff will also make recommendations regarding housing or job assignments and other changes as requested."** (emphasis added).

9) Wexford was responsible for providing the psychiatric services set forth in the MSA to inmates at SCI-Houtzdale while Scherer was incarcerated there.

14) Prior to starting to work for Dr. Khan and FCCG, Dr. Husain does not recall meeting with any representative from Wexford.

15) Prior to starting to work for Dr. Khan and FCCG, Dr. Husain does not recall receiving any policies and procedures regarding caring for inmates with mental illness.

16) Prior to starting to work for Dr. Khan and FCCG, Dr. Husain does not recall receiving any instructions about how frequently he should see inmates in the RHU.

17) Dr. Husain said in his deposition he knew nothing about credentialing with Wexford and claimed that Dr. Khan "worked it out" with Wexford.

18) Dr. Khan stated in his deposition that "Dr. Husain directly provided that [credentialing information] to the Wexford staff."

26) The Chief Psychologist at SCI-Houtzdale state that there always had been difficulty in having consistent psychiatric services because many psychiatrists would come and go, some working at SCI-Houtzdale for as little as a day.

28) The medical records reflect more than twenty-five psychiatric mental health professionals provided treatment to Scherer during his incarceration prior to his death.

29) Prior to and at the time of Scherer's death, inmates with mental illness could be placed in different levels of specialized housing, including Special Needs Units (SNUs), Intermediate Care Unit (ICU), Special Assessment Unit (SAU) and Special Observation Unit (SOU).

30) SNUs are non-licensed living areas or blocks located where inmates with special mental health/retardation or medical needs can receive additional or more intense treatment services, support, and/or protection. The ICU at Waymart is a 50-bed living unit that accepts inmates who have a history of serious mental illness, psychiatric hospitalizations, and SNU placements.

31) When inmates with serious mental illness act out in inappropriate ways as a result of their mental illness which may subject them to disciplinary sanctions, the psychologists and psychiatrists at the facility are to review the status of the inmate to determine whether the inmate can be stabilized at the existing facility or whether his mental illness should be accommodated by moving the inmate to a different, more specialized facility, such as the ICU at Waymart.

37) On July 8, 2002, Mr. Schuster stated Scherer was "delusional and manic" and "is presently experiencing an exacerbation of his psychopathological condition."

38) On July 12, 2002, Scherer was observed engaging in bizarre behavior, including rummaging through trash cans, mumbling and stating he was going to kill himself.

39) On July 13, 2002, Scherer was placed in a Primary Observation Cell...by...Dr. Khan.

40) On July 17, 2002, Dr. Khan released Scherer from the POC even though Scherer would not talk with Dr. Khan....

43) On July 26, 2002, shortly after being released from the POC by Dr. Khan, Scherer engaged in disruptive behavior...result[ing] in a misconduct being issued. Scherer was placed in the RHU pending his misconduct hearing.

44) On July 29, 2002, at Scherer's misconduct hearing, Scherer engaged in bizarre and strange behavior stating to the hearing examiner that "My brother is bringing me a pizza and I really like the Klondike bars. I was really feeling bubbly."

45) Scherer was found guilty of the misconduct and received discipline of 60 days in the RHU.

46) At the time Scherer was placed in the RHU..., the psychiatrist provided by Wexford had changed from Dr. Khan to Dr. Husain.

47) Dr. Husain does not even remember if he saw [Scherer].

50)(a) On July 13, 2001, Monica was hearing voices, tried to commit suicide, had to be extracted from his cell and was placed in the POC. (b) On August 7, 2001, Monica was non-compliant with his anti-depressant medication. (c) On October 4, 2001, Monica was placed in the Special Needs Unit for ninety day observation. It was noted he had three psychiatric hospitalizations in the past. (d)

On April 14, 2002, Monica received a misconduct for an attempted assault (a Class I misconduct) on a guard and was found guilty on that charge on April 23, 2002. (e) On April 14, 2002, Monica received a second misconduct for threatening an employee or their family with bodily harm (which also was a Class I misconduct) and was found guilty on April 16, 2002.

51) The size of the cell where Scherer was placed with Monica was essentially 7 feet by 9 feet with a little space at the door and a very small window.

## 2. **Analysis**

Wexford moves for summary judgment with regard to the § 1983, ADA and RA claims made against it by the Plaintiff. Wexford presents three arguments in its Brief in Support of its motion.

**a**

First, Wexford moves for summary judgment on the Plaintiff's § 1983 claim against it reasoning that it had no personal involvement in the policy of double-celling inmates, and such a policy was maintained by the DOC and adhered to by Wexford. Wexford's Brief (Document No. 136), pp. 6-11. The Plaintiff counter-argues that Wexford exhibited deliberate indifference to the Decedent's rights for Wexford's failure to properly train and supervise "FCCG's locum tenens psychiatrists" in that it knew of the difficulties faced by such psychiatrists not only with new inmate-patients but also correctional staff in addition to the fact that "Wexford failed to follow its own requirements for credentialing these short-term psychiatrists, which was the only safeguard in place to review the locum tenens psychiatrists before they started seeing inmates." Plaintiff's Brief (Document No. 148), pp. 10, 11. Plaintiff also argues that in the absence of correctional psychiatry experience, training and

78

supervision by Wexford, and practically no personal experience with the individual prisoner-patients presented the locum tenens with difficult choices as psychiatrists and resulted in incorrect actions taken by such psychiatrists as to the treatment they rendered. Plaintiff's Brief, pp. 11-12.

While Wexford argues that it followed the policies of the DOC with respect to the housing of inmates, the Plaintiff's response focuses upon the inaction of Wexford with respect to the locum tenens hired by FCCG. Although it remains disputed if FCCG is bound by the MSA, FCCG subcontracted with Wexford who also contracted directly with the DOC. *West, supra,* provides that doctors who contract with state prison systems are in fact acting under color of state law. Recognizing this principle, it is difficult to conclude otherwise with respect to an entity such as Wexford, who contracted directly with the DOC, but did not employ the locum tenens who actively maintained the practice of treating the prisoners Wexford contracted with the DOC to treat. Therefore, with the Plaintiff's claims of deliberate indifference as they concern Wexford directed to Wexford's alleged failure to train and supervise the locum tenens as well as verify their credentials, the Plaintiff's claims speak to issues entirely separate from Wexford's attempt to separate itself from the DOC's inmate housing policies. Indeed, the Plaintiff states his claim as "whether there was adequate training with respect to the [DOC] policies." Plaintiff's Brief, p. 14 (citing *Canton,* 489 U.S. at 378). Summary judgment is denied as to this argument.

The Plaintiff further argues that the "policy" of providing psychiatric care for the prisoners of SCI-Houtzdale, specifically the Decedent, through the use of psychiatrists who worked for short periods of time coupled with their inadequate "training and credentialing" lead to deliberate

79

indifference to the Decedent's medical needs. Plaintiff's Brief, p. 17. The Court has already addressed this issue under FCCG's motion and found that the Impartial Locum Tenens division of FCCG provided only one of the doctors who treated the Decedent–Husain. Thus, the use of short-term Impartial Locum Tenens psychiatrists did not result in a revolving door of psychiatrists from that part of the FCCG organization. Husain, in fact, was the last psychiatrist who treated the Decedent. Prior to that, FCCG treated the Decedent through Khan's efforts, and before that the DOC treated him through Dr. Fisher until he left in June of 2002. Certainly the continuity of care was an issue but it was not because of a revolving door of psychiatrists assigned by the Impartial Locum Tenens division of FCCG. Therefore, any lack of credentialing of Husain or medication prescribed by Husain standing alone do not demonstrate deliberate indifference to the Decedent by Wexford. However, a claim of deliberate indifference based upon the absence of training for Husain may be present, but this again depends upon the application of the terms of the MSA, specifically Wexford's responsibility with respect to Husain, and this fact remains in dispute. Therefore, any claim based upon lack of training a short term psychiatrist, *i.e.* Husain, survives summary judgment, but summary judgment is granted as to all other arguments concerning Impartial Locum Tenens.

Finally, the Plaintiff argues that Wexford was bound by the MSA to provide "comprehensive psychiatric services." Plaintiff's Brief, p. 18. "This included specific duties and obligations to monitor and protect inmates with mental illness housed in the RHU." *Id.* It is the Plaintiff's argument that Wexford allowed the Plaintiff's illness to progress, that he should have been treated outside of SCI-Houtzdale and that by being kept there and treated (or not treated) by the short-term psychiatrists at SCI-Houtzdale, Wexford violated the Decedent's Eighth Amendment rights by being deliberately

80

indifferent to a "substantial risk to [the Decedent's ] safety and health". Plaintiff's Brief, pp. 17-18. As analyzed previously, the MSA provided only for the consultation of medical staff as to the patient housing upon request, not a relinquishing of housing decisions by DOC to the medical staff. This provision of the MSA clearly would be applicable to Wexford as a party to the MSA as opposed to Husain. *See* p. 40. Yet no evidence in the record demonstrates that Wexford, or even Husain, assuming Husain was bound by the MSA, was requested to provide advice as to the Decedent's housing status. Alternatively, the MSA may not have been in effect during the time of the Decedent's death and in such a case, Wexford cannot be held to its terms. In either instance, Wexford cannot be liable for any claims that it permitted the Decedent to be assigned to the RHU or otherwise remain there despite his mental illness. As a result, the motion is granted as to this argument.

**b**

Wexford's second argument is that summary judgment should be granted as to the Plaintiff's claims against it because the death of the Decedent was caused by an intervening cause: Monica's murder of the Decedent. The issue here becomes focused upon the employment of locum tenens, and their alleged lack of training and Wexford's lack of supervision of them and if such circumstances caused the Decedent's death. Despite the survival of some of the Plaintiff's arguments in subsection "a" above as to training and supervision of locum tenens and the use of such psychiatrists, the following analysis of the record and the applicable law demonstrates that they cannot be said to have caused the Decedent's death pursuant to the standards of § 1983.

81

We first turn back to the analysis used with respect to the § 1983 claim against FCCG. Wexford, like FCCG is considered to be acting under color of law in accordance with *West* as Wexford is performing the DOC function of providing medical services and the right in issue is the Eighth Amendment right to be free from cruel and unusual punishment. However, before proceeding, the Court notes that the Plaintiff's counter-argument to FCCG's causation argument is that the Decedent was subject to deliberate indifference to his "serious medical needs and to a substantial risk of serious harm to him." Plaintiff's Brief, p. 20. Plaintiff cites *Farmer* for this proposition. However, *Farmer* relates the subjective standard of deliberate indifference for the actions of *prison officials*, not governmental entities. *Farmer* reads in pertinent part:

Because "deliberate indifference" is a judicial gloss, appearing neither in the Constitution nor in a statute, we could not accept petitioner's argument that the test for "deliberate indifference" described in *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), must necessarily govern here. In *Canton,* interpreting Rev.Stat. § 1979, 42 U.S.C. § 1983, we held that a municipality can be liable for failure to train its employees when the municipality's failure shows "a deliberate indifference to the rights of its inhabitants." 489 U.S., at 389, 109 S.Ct., at 1205 (internal quotation marks omitted). In speaking to the meaning of the term, we said that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.,* at 390, 109 S.Ct., at 1205; see also *id.,* at 390, n. 10, 109 S.Ct., at 1205, n. 10 (elaborating). Justice O'CONNOR's separate opinion for three Justices agreed with the Court's "obvious[ness]" test and observed that liability is appropriate when policymakers are "on actual or constructive notice" of the need to train, *id.,* at 396, 109 S.Ct., at 1208 (opinion concurring in part and dissenting in part). It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.

*Canton's* objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases.

Section 1983, which merely provides a cause of action, "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). And while deliberate indiffere nce serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability, see *Wilson,* 501 U.S., at 299-300, 111 S.Ct., at 2325, the "term was used in the *Canton* case for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents," *Collins v. Harker Heights,* 503 U.S. 115, 124, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992), a purpose the *Canton* Court found satisfied by a test permitting liability when a municipality disregards "obvious" needs. Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official. For these reasons, we cannot accept petitioner's argument that *Canton* compels the conclusion here that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it.

*Farmer v. Brennan,* 511 U.S. 825, 840-841, 114 S.Ct. 1970, 1980-1981, 128 L.Ed.2d 811, 827-828 (1994).

Although Wexford is not a municipality, *Canton's* objective deliberate indifference standard clearly controls the liability of Wexford, as a contractor of the DOC. *See Carswell v. Borough of Homestead,* 381 F.3d 235, 244 (3d Cir. 20 04)("District Courts must review claims of municipal liability "independently of the section 1983 claims against the individual police officers." (citations omitted)). The Court sees no reason to apply a different standard for a municipal corporation than for a private corporation, each being charged with exercising their own compliance with the rights of citizens they serve. Therefore, Wexford is held to the *Canton* standard of deliberate indifference.

Plaintiff responds to Wexford's argument by stating that it is liable for its lack of sufficient training and supervision of the locum tenens psychiatrists as well as harboring the locum tenens program that allegedly provided inconsistent care for the prisoners. However, *Canton* makes clear that

83

causation of injury does not automatically result from a faulty training program. *Canton* at 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412, 428.

First, the Plaintiff attempts to, but cannot, import *Farmer's* standard of deliberate indifference onto Wexford in this instance. Second, the Plaintiff points to no matter in the record that supports a claim that the absence of a training program for psychiatrists or deficiencies in training that was provided resulted in the death of the Decedent. Plaintiff's focus on separation from other prisoners and the implied need to train the short-term psychiatrists as to the available prisoner housing options do not illucidate how the training provided, or not provided, caused the death of the Decedent. The Decedent was released from a POC after being stabilized; such was a medical decision and the Plaintiff cannot make claims for medical malpractice under § 1983. The Plaintiff's continued invocation of the MSA contract terms fails to recognize that under that agreement Wexford psychiatrists were to "make recommendation[s] regarding housing...as requested." *Supra*, p. 42. Khan made a recommendation to release the Decedent from the POC, and no evidence on the issue of training has been presented by the Plaintiff as the cause for Khan's release of the Decedent from the POC. Therefore, no disputed issue of training locum tenens psychiatrists appears from the record and summary judgment is granted as to this argument.

Plaintiff's counter-argument appears to be more focused on the failure to supervise and the policy of employing short-term psychiatrists. The Plaintiff's expert offers that the continued turn-over of psychiatrists treating the Decedent created mental instability and ineffective treatment of his condition resulting in his death. Plaintiff's Brief, p. 20. The Plaintiff argues that this can be traced to

84

the following sequence of events: inadequate psychiatric care resulting in the Decedent's misbehavior, then the Decedent being found by a prison official to have committed a misconduct, resulting in him being placed in the RHU, causing him eventually to be double-bunked in the RHU with Monica and then the occurrence of an argument between the two ultimately resulting in the Decedent's death. However, the Plaintiff presents no evidence that Wexford knew of the risk that the Decedent would be harmed or killed because of a history, whether personal to the Decedent or generally as to DOC's practice of corrections, that psychiatric patients within the prison population would be harmed in the RHU. The Decedent was in the RHU for his own misconduct, and while for the purposes of this motion it may have possibly been a result of his psychological condition, he was removed from general population in order to remove him as a threat to others.

It has not been established that the failure to supervise the small numbers of short-term psychiatrists, or that their limited numbers alone, resulted in a known threat that psychiatric patients would be misplaced in an improper housing classification, other than general population. Clearly, the remarks of Mr. Shuster represent a known threat to psychiatric patients placed in the general population, but not in the RHU. *See* Plaintiff's Brief, p. 21. The Plaintiff's claim is held to the higher knowledge requirements of the objective standard of *Canton*, not *Farmer*. Furthermore, as Wexford cites from the record, Monica and the Decedent had no altercations for a period of July 30, 2002 until his death on August 6, 2002. *See McDowell v. Brown*, 392 F.3d 1283, 1291-1292 (11th Cir. 2004)(finding no culpability in county where its officials were unaware that the "underfunding" of correctional facility resulted in delayed medical treatment). It has not been demonstrated that the staffing policy of permitting short-term psychiatrists to treat the Decedent or that a failure to provide

85

for adequate supervision of such psychiatrists presented a situation that can objectively be said to have placed the Decedent in danger of being murdered. Therefore, these claims as to supervision and the staffing policy fail to present evidence of the requisite deliberate indifference necessary to prove *liability* as to Wexford. Summary judgment is granted as to this argument.

The Plaintiff's claims as to the issues of supervision and staffing policy also fail to present evidence of *causation*. While causation and culpability run hand-in-hand in these instances of § 1983 litigation, the Court looks to the issue of whether the deliberate indifference "directly caused a deprivation of federal rights." *Board of County Commissioners of Bryan County, OK v. Brown*, 520 U.S. 397, 415-416, 117 S.Ct. 1382, 1393-1394, 137 L.Ed.2d 626, 646 (1997); *see also Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). Assuming culpability on Wexford's part in that it was deliberately indifferent under the standard set forth in *Canton*, and that it was known that prisoners would be placed in the RHU as a result of misconduct that manifested after inadequate treatment by the locum tenens, can it be said that placement in the RHU as a result of deliberate indifference would result in death? The Plaintiff provides no direct connection between the DOC's alleged placement of prisoners in need of psychiatric treatment in the RHU and Wexford's liability for the death of the Decedent by the hands of another inmate. If the facts demonstrated deliberate indifference under these circumstances, such deliberate indifference does not reach to the point of causing the Decedent's death, rather the facts only present a possible claim of improper discipline of prisoners with a need for psychiatric treatment. As the Supreme Court has noted in *Brown*, a § 1983 action alleging an inadequate background check of a sheriff's deputy who allegedly used excessive force, "every injury is traceable to a hiring decision" *Brown* at 415, 117 S.Ct. at 1394, 137 L.Ed.2d at

646. Wexford's actions or inaction as the contractor overseeing psychiatric treatment and permitting the practice of locum tenens to treat prisoners at SCI-Houtzdale did not directly result in the death of one of those prisoners because Khan decided he was fit to be released from the POC. Viewing causation as the Plaintiff does would result in what the Supreme Court feared would happen to municipalities in *Brown*—*respondeat superior* liability would become the standard for such entities and their contractors, such as Wexford. Wexford's motion for summary judgment on the Eighth Amendment / § 1983 claim is granted due to a lack of causation.

c

Wexford's final argument is that the Plaintiff's ADA claim does not state a claim against it because the claim lacks an allegation of discrimination.[12] The Plaintiff generally argues that Title II of the ADA applies to "state prisons" and that "material facts remain in dispute" as to this issue. Plaintiff's Brief, p. 22. The Plaintiff elaborates that "Wexford failed to provide [the Decedent] with a reasonable accommodation for his mental illness (such as transferring him to the Intermediate Care Unit at Way[mart])"; "allowing [the Decedent] to be placed in the RHU as a result of conduct arising from his mental illness caused [the Decedent] to be denied the benefits and programs of the Special Needs Unit and other mental health programs because of Scherer's disability"; "Wexford acquiesced in the use of the RHU as a method of punishment for [the Decedent's] actions that were a manifestation of his serious medical need; and...Wexford failed to institute training procedures to properly train the psychiatrists in the requirements of the ADA." Plaintiff's Brief, pp. 23-24.

---

[12]Wexford also argued that the RA claim made by the Plaintiff fails for lack of proof of Wexford's receipt of federal funding, the Plaintiff concedes that Wexford received no such funding and therefore his RA claimagainst Wexford fails.

First, the Supreme Court has made clear that Title II of the ADA applies to state prisons and the services they provide to prisoners, including "medical 'services'". *Pennsylvania Dept. Of Corrections v. Yeskey*, 524 U.S. 206, 209-210, 118 S.Ct. 1952, 1954-1955, 141 L.Ed.2d 215, 219 (1998). The prohibition of discrimination set forth in Title II of the ADA reads as follows: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Plaintiff cites to 42 U.S.C. § 12182(b)(2)(A)(ii) for the definition of discrimination as including a failure to accommodate, but this section is limited in application of Title III of the ADA. See 42 U.S.C. § 12182(b)(2)(A). However, this Court has previously found in *Purcell v. Pennsylvania Dept. Of Corrections*, 2006 WL 891449 at pp. * 11-12, 2006 U.S. Dist.LEXIS 42476 at pp. * 31-32 (W.D.Pa. March 31, 2006) that public entities such as state prisons, must make a "reasonable modification" as set forth in 28 C.F.R. § 35.130(b)(7) which reads: "(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." In *Purcell*, this Court found that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the Department of Corrections refused to circulate a memo to the staff concerning a prisoner's Tourette's Syndrome that explained that some of his behaviors were related to his condition, not intentional violation of prison rules. *Purcell* at 2006 WL 891449 at p. * 13, 2006 U.S. Dist.LEXIS 42476 at pp. * 35-36.

Although not expressly addressed by the parties, the Court will assume for purposes of the present circumstances that a need for accommodation was apparent whether or not the Decedent requested such modification under the ADA. Therefore, we will assume that a request was in essence made. The Court will focus upon the reason for the refusal to transfer the Decedent to another facility in light of his mental illness or the refusal to remove him from the RHU and alternatively place him in the SNU within SCI-Houtzdale.

In an analogous situation, the Third Circuit has concluded that the reason an Alzheimer's Disease patient was denied access to a facility, not why she sought access, was the basis for evaluating a violation of the RA. *See Wagner by Wagner v. Fair Acres Geriatric Center*, 49 F.3d 1002, 1010 (3d Cir. 1995). *Chisholm v. McMannion*, 275 F.3d 315, 32 (3d Cir. 2001)(ADAand RA the same). The very definition of discrimination under Title II of the ADA works in the same manner: discrimination must be based upon the disability. The ICU unit at SCI-Waymart most certainly would be a part of the medical services provided by the DOC, and could be an option for treatment within the DOC, and the MSA, if applicable to Husain and Kahn, required them to make regular rounds within the RHU and SNU at SCI-Houtzdale and make recommendations on housing when such consultations are sought by the DOC. Even if it was an operable contract that controlled Husain and Khan's actions, nothing in the MSA or other evidence presented demonstrates that Wexford could have caused a transfer of the Decedent to SCI-Waymart. The Decedent has previously been at SCI-Waymart. Moreover, the decision to remove the Decedent from the POC was based upon the release by Khan, who made a medical decision. After that release, a misconduct occurred that resulted in the Decedent's placement in the RHU. It appears from the record that the evidence does not support the argument that

discrimination under Title II of the ADA occurred by the Plaintiff's general observation that the Decedent should have been housed at SCI-Waymart. However, it remains in dispute whether the Decedent's misconduct, that resulted in his placement into the RHU was a result of his mental illness. Therefore, the lack of modification of its disciplinary procedures to account for and place the staff on notice of Decedent's mental illness, similar to the claim in *Purcell*, possibly resulted in a violation of Title II of the ADA in the denial of necessary mental health treatment in response to his misconduct. However, this would only implicate DOC's disciplinary actions, not Wexford or its putative subcontractors' treatment of the Decedent. Wexford's employees or subcontractors had no power over the prisoner housing assignments. From the record, it also appears that Wexford played no role in disciplinary procedures.

As for the second argument regarding the denial to the Decedent of placement in the SNU or mental health programs because of his placement in the RHU, the Decedent was not denied any benefits. Under the ADA, the Decedent received medical treatment in the RHU. The Decedent was not kept in the RHU because of mental illness, but because of his misconduct. Mental illness may contribute to misconduct but his placement was based upon misconduct, not because of a policy that those prisoners diagnosed with mental illness are to be housed in the RHU. Therefore, based on the record, there was no discrimination based upon mental illness under the ADA.

Next the Plaintiff seeks to hold Wexford liable for acquiescing in the discriminatory actions of the DOC. Plaintiff's Brief, pp. 25-26. The Plaintiff attempts to borrow this theory from Title VII claims. *Id. (citing Greenier v. PACE, Local No. 1188*, 201 F.Supp.2d 172 (D.Me. 2002)). The Plaintiff views Wexford's obligation as one requiring it to present advice as to the treatment and

housing of the Decedent in consideration of his mental illness. *Id.* at pp. 26-27. However, the Plaintiff once again fails to recognize that the MSA provides for the such advice to be given by Wexford when "requested". The record does not reflect that Wexford, in its medical treatment of prisoners, had a veto power over DOC actions as to discipline and housing. In addition, Wexford appears not to have been consulted regarding the disciplinary action to house the Decedent in the RHU and may have only come to have constructive notice when Husain, as a subcontractor of FCCG, which in turn is alleged to be Wexford's subcontractor, visited the Decedent in the RHU. Under the present facts it has not been proven that Wexford was aware of the situation and failed to act during the process to place the Decedent in the RHU. Finally as the Plaintiff has recognized, the theory of "deliberate acquiescence" found in *Greenier* has not been recognized by the Third Circuit in the context of the ADA in matters not related to employment discrimination. This argument in support of the Plaintiff's ADA claim fails.

Finally, as to the Plaintiff's fourth argument, the failure to train its psychiatrists or more accurately, its alleged subcontractors, such as Husain, in the options available to them in treatment and accommodating prisoners with mental illness such as the Decedent resulted in discrimination in the failure to reasonably accommodate the Decedent. Plaintiff's Brief, p. 27. The case of *Schorr v. Borough of Lemoyne*, 243 F.Supp.2d 232 (M.D.Pa. 2003) certainly lends credence to such a theory that a failure to train is a failure to accommodate under the ADA. This is a theory that has not been recognized within Third Circuit precedent, but the Eastern District of Pennsylvania has also recognized such a claim in *Hogan v. City of Easton*, 2004 WL 1836992 at pp. * 6-7, 2004 U.S. Dist. LEXIS 16189 at pp. *19-20 (E.D.Pa. August 17, 2004). Even if this theory were recognized by the Third Circuit, such a modification may be countered under the present circumstances by the fact that it presents an

impermissible modification under the ADA regulations. "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." *Easley by Easley v. Snider*, 36 F.3d 297, 305 (3d Cir. 1994)(citations omitted). Plaintiff suggests Husain, assuming he is a subcontractor of Wexford, "had an obligation to intervene on behalf of Scherer when it was apparent that the RHU was not an appropriate placement for him." Plaintiff's Brief, p. 27. Allowing Wexford, Husain or any other medical provider to have the authority to overrule housing decisions of the DOC would alter the manner in which DOC classifies its prisoners. The ADA cannot remove such correctional decisions from the states' control. Such a modification if permitted, would certainly be unreasonable.

The level of training generally provided to Husain is a fact in dispute. Furthermore, the status of the subcontracts as they relate to the MSA and the duties among the contractors establish more factual disputes related to this issue. Specifically, if the MSA does not apply to the subcontractors, the powers of the subcontractors do not appear in the record and thus remain in dispute or alternatively, if the MSA does apply to the subcontractors' actions, the provision requiring the subcontractors to provide psychiatry services empowers them to consult on housing assignments as requested and nothing of record demonstrates a request as having been made by DOC. The factual disputes regarding the applicability of the MSA place this argument into the realm of factfinding designated only to a jury. Additionally, on the legal side of this argument, with two of our sister district courts of this circuit having embraced a claim for the failure to train as a failure to modify claim under the ADA, this Court will permit the Plaintiff's ADA claim to proceed on the possibility that the MSA applies to FCCG, Khan and Husain. If it is not applicable, the powers of Khan and Husain remain in dispute based upon

92

the record before the Court, which in turn permits the Plaintiff's ADA claim against Wexford to proceed. If the jury finds the MSA does not apply, the Plaintiff can advance a failure to train theory subject to Wexford demonstrating such training would fundamentally alter its psychiatric services provided to prisoners. Summary judgment is denied as to this argument.

## III. Plaintiff's Motion Seeking Leave to File a Second Amended Complaint to Add Count II (Document No. 137)

Plaintiff has filed a Motion Seeking Relief to file a Second Amended Complaint to Add Count III. Count III alleges a Pennsylvania state law claim of negligence against "Ocilka, Schuster, Greenleaf, Wexford, Khan, Husain and FCCG." Proposed Second Amended Complaint (Document No. 137) Exhibit A, ¶ 99.

Under Federal Rule of Civil Procedure 15(a), a party may amend his "pleading once as a matter of course at any time before a responsive pleading is served." Plaintiff filed an Amended Complaint on January 8, 2007 replacing several Jane/John Doe Defendants with named parties after obtaining leave of court. *See* Document No. 101. Wexford filed an Answer to the Amended Complaint on January 29, 2007. *See* Document No. 103. No other Defendant has filed an answer to the Amended Complaint, but as analyzed above, all Defendants have either filed motions to dismiss, motions for summary judgment, or both. Khan and FCCG, as well as Wexford and Husain, have filed Briefs in Opposition to Plaintiff's Motion Seeking Leave to File a Second Amended Complaint to Add Count III, and they all advance similar arguments. *See* Document Nos. 142, 144, and 145, respectively.

Ocilka, Schuster, and Greenleaf have not filed an answer to the Amended Complaint and have not filed any opposition to the Plaintiff's Motion.

Generally, in actions with multiple defendants where not all defendants have filed a responsive pleading to the complaint, the plaintiff would be allowed to amend his complaint as to the non-answering defendants without leave of the court. *See Goldlawr, Inc. v. Shubert*, 169 F.Supp. 677 (E.D.Pa. 1958). A motion to dismiss pursuant to Rule 12(b)(6) is not a responsive pleading, nor is a Rule 56 motion for summary judgment, and Plaintiff is allowed to amend "as a matter of course" as to those Defendants who have not filed responsive pleadings. *Kelly v. Delaware River Joint Commission*, 187 F.2d 93, 94 (3d Cir. 1951); *Park-In Theatres v. Paramount-Richards Theatres*, 9 F.R.D. 267, 269 (D.Del. 1949). The Plaintiff in the present case already sought and was granted leave to amend once, but has never sought to amend "as a matter of course." Khan, FCCG, Husain, Ocilka, Schuster and Greenleaf have not filed an answer to the Amended Complaint and the Plaintiff has not previously sought to amend "as a matter of course" this Amended Complaint (or his original Complaint). An amended pleading supercedes the original and the original pleading no longer serves any function in the case. *See United States v. L. D. Caulk Co.*, 114 F.Supp. 939, 940 (D.C.Del. 1953); 6 Charles A. Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1476 at 556-58 (2d ed. 1990 & Supp.2007). Therefore, it is as if the pleading in this case is re-commenced with the filing of the Amended Complaint and Khan, FCCG, Husain, Ocilka, Schuster, and Greenleaf have not filed answers to the Amended Complaint but chose to file motions to dismiss and alternative motions for summary judgment. The Plaintiff therefore is free to file his Second Amended Complaint to add a negligence claim against Khan, FCCG, Husain, Ocilka, Schuster, and Greenleaf.

It is noted by the Court that any proposed Second Amended Complaint at Count III must conform with the requirements of Pennsylvania Rule of Civil Procedure 1042.3. *See Velazquez v. UPMC Bedford Memorial Hospital.* 328 F.Supp.2d 549, 558 (Pa.R.C.P. 1042.3 requiring filing of certificate of merit in professional liability actions is a substantive rule of law applicable in a federal diversity action); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1085 (3d Cir. 1991)("state law governs the decision of substantive issues in federal diversity actions and in pendent state claims."); *Bouker v. CIGNA Corp.*, 847 F.Supp. 337 (E.D.Pa. 1994)("with respect to a supplemental state law claim, federal courts must apply state substantive law."(citations omitted)).

In light of the filing of an answer by Wexford, the Plaintiff's right to amend "as a matter of course" has been terminated as to Wexford. Fed. R. Civ. P. 15(a). However, Wexford has filed a brief opposing the Plaintiff's motion (*see* Document No. 144) and because Wexford has answered the Amended Complaint, this Court must decide if the Plaintiff should be given leave to amend, which will be "freely given [if] justice so requires." *Id.*

Wexford argues that the Plaintiff's request to amend the Amended Complaint is futile because of 1) the application of immunity; and 2) lack of causation because of the "superseding/intervening" acts of Monica. Wexford's Brief, pp. 3-7.

## A. Futility

In assessing futility, a court may treat the challenged proposed amendment as if it were analyzing it under a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *See Massarsky v. General Motors Corp.*, 706 F.2d 111 (3d Cir. 1983). In analyzing a motion to dismiss, "the district court [is] required to accept as true all allegations in the complaint and all reasonable inferences that

95

can be drawn from them after construing them in the light most favorable to the non-movant." *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *D.P. Enters., Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir. 1984). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 1275 S.Ct. 1955, 1969, 167 L.Ed.2d 929, 945 (2007) (citations omitted). The complaint that states "a plausible entitlement to relief" is the complaint that survives a Rule 12(b)(6) motion as well satisfies the Rule 8 pleading requirement. *Id.* at __, 127 S.Ct. at 1964-65, 1967, 167 L.Ed.2d at 940, 942.

## 1. Immunity

Wexford claims immunity from suit under the Pennsylvania Mental Health Procedures Act (hereinafter "MHPA"), which provides:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a). However, the act itself limits its application to

> all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons. "Inpatient treatment" shall include all treatment that requires full or part-time residence in a facility. For the purpose of this act, a "facility" means any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients.

96

50 P.S. § 7103. Therefore, the MHPA would only apply if the Decedent was receiving 1) involuntary inpatient or outpatient care or 2) voluntary inpatient care. *Id.* The MHPA states that "[w]henever a person who is charged with crime, or who is undergoing sentence, is or becomes severely mentally disabled, proceedings may be instituted for examination and treatment under the civil provisions of this act in the same manner as if he were not so charged or sentenced." 50 P.S. § 7401(a). It further states that "[w]henever a person who is detained on criminal charges or is incarcerated is made subject to inpatient examination or treatment, he shall be transferred, for this purpose, to a mental health facility." 50 P.S. § 7401(b). The question, therefore, is whether Wexford's treatment of the Decedent falls within the scope of the MHPA, resulting in Wexford's immunity from suit. Preliminarily, the Court recognizes that Wexford, as a corporation, is not excluded from the definition of "person" under § 7114. *See Farago v. Sacred Heart General Hospital*, 528 A.2d 986, 987 (Pa. Super. 1987) *aff'd,* 562 A.2d 300 (Pa. 1989).

Inpatient treatment requires admission, either full or part-time, to a mental health facility. *See* 50 P.S. § 7103. In the case *sub judice*, there are no allegations that the Decedent was admitted to a "mental health facility," as the term is used within the MHPA, any time immediately prior to his death. The Decedent was placed into a Primary Observation Cell[13] (POC) on several occasions during his incarceration. Amended Complaint, ¶¶ 34, 52. He was released from the POC for the last time on July 17, 2002, about three weeks prior to his death on August 6, 2002. Amended Complaint, ¶¶ 53, 68.

---

[13]Plaintiff refers to a "Primary Observation Cell" while Medical Defendants refer to a "Psychiatric Observation Cell." As the Decedent was only placed in the POC because of the state of his mental health, it seems that the cell was likely called a Psychiatric Observation Cell. However, as this Court must resolve all factual disputes in a light most favorable to the Plaintiff, it will be referred to as a Primary Observation Cell at this stage. However, the analysis would remain the same regardless of the actual name of the POC.

Even were this Court to disregard the time lapse between his release from the POC and his death, it would be difficult to conclude that the confinement in a POC constituted admittance to a mental health facility within the parameters of the MHPA. The name of the cell itself suggests that it is used primarily for observation. Additionally, the Decedent was transferred to other locations (SCI-Cresson Mental Health Unit and SCI-Waymart) for inpatient treatment several times before November of 2001. Amended Complaint, ¶¶ 35, 41. Therefore, the Decedent was not undergoing any type of inpatient treatment at any time in the months leading up to his death. Accordingly, in order for Wexford to be immune from suit under the MHPA, the Decedent must have been undergoing involuntary outpatient treatment. *See* 50 P.S. § 7103. The procedures for instituting involuntary treatment under the MHPA are laid out beginning in section 301 of the Act and following. *See* 50 P.S. § 7301 *et. seq.* The procedures for involuntary treatment are the same whether the person to be treated is imprisoned or not. *See* 50 P.S. 7401(a). Wexford has not presented any facts that establish that involuntary commitment proceedings under the MHPA were commenced against the Decedent and therefore, in the absence of the possibility of the Decedent having been involuntarily committed to outpatient care for the period in question under the MHPA, the immunity provisions of the MHPA are inapplicable to Wexford. The Middle District of Pennsylvania has reached a similar conclusion with respect to medical negligence claims against nurses from the York County Prison who treated a suicidal inmate. *See Herman v. County of York*, 482 F.Supp.2d 554, 567-568 (M.D.Pa. 2007). Wexford's citation of *Ozoemena v. City of Philadelphia*, 1997 WL 633749 at pp. * 5-8, 1997 U.S. Dist.LEXIS 15282 at pp. * 15-22 (E.D.Pa. Oct. 1, 1997), is inapposite as the court in that matter never touched upon the issue of voluntary or

involuntary commitment to a "facility" under the MHPA, but only addressed the level of negligence alleged.

## 2.    Lack of Proximate Cause

Additionally, Wexford incorporates an argument from its Motion for Summary Judgment and accompanying Brief (*see* Document Nos. 135 and 136) into the issue. Wexford claims that the fight between the Decedent and Monica was an unforeseeable intervening cause that broke the chain of causation, and adding the count of negligence would be futile because Wexford's actions/inactions were not the proximate cause of the Decedent's death. Document No. 136, pp. 11-19.

Unlike our previous analysis of causation under § 1983, Pennsylvania law controls our consideration of causation under the Plaintiff's proposed negligence claim. Pennsylvania recognizes that criminal acts, such as Monica's, "do[] not act as a *per se* superseding force." *Powell v. Drumheller*, 653 A.2d 619, 624 (Pa. 1995). "Instead, the proper focus is not on the criminal nature of the negligent act, but instead on whether the act was so extraordinary as not to be reasonably foreseeable." *Id.* "A determination of whether an act is so extraordinary as to constitute a superseding cause is normally one to be made by the jury." *Id.*

The facts of record demonstrate that it was foreseeable that the Decedent's mental illness would affect his interactions with others as was evidenced from his previous behavior that resulted in him being ordered confined to the RHU. It is disputed whether Husain and Khan, as psychiatrists subcontracted to perform the duties of Wexford specifically observed the Decedent in the RHU or knew that double-celling of the Decedent in the RHU could occur and result in an altercation with another inmate. The extent of the negligence claim against Wexford is unknown from the limited allegations

99

proposed for Count III. Nevertheless, at this stage, the criminal acts of Monica are not considered a *per se* supervening cause and the facts developed in the record remain in dispute as to whether Monica's actions present such a supervening cause. Therefore, futility of the Second Amended Complaint as to Wexford has not been proven. The Plaintiff is granted leave to file his Second Amended Complaint that also adds Wexford as a defendant to the newly added Count III.

Although the addition of the Plaintiff's third count may not be a futile claim, the Court must address Wexford's concern with the timeliness of the Plaintiff's motion.

### B. Undue Delay and Prejudice to Wexford

Finally, the Court addresses Wexford's objection to permitting the filing of the Second Amended Complaint based upon what appear to be arguments of undue delay and prejudice to Wexford. "While Rule 15(a) provides that leave to amend should be "freely given," a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party. *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005). A delayed motion to amend under Rule 15 is not a sufficient basis to deny the motion. *Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

> However, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Adams*, 739 F.2d at 868. Delay may become undue when a movant has had previous opportunities to amend a complaint. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir.1993) (three year lapse between filing of complaint and proposed amendment was "unreasonable" delay where plaintiff had "numerous opportunities" to amend); *see also Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 654-55 (3d Cir.1998) (rejecting proposed second amended complaint where plaintiffs were repleading facts that could have been pled earlier). When a party delays making a

motion to amend until after summary judgment has been granted to the adverse party, other courts have recognized that the interests in judicial economy and finality of litigation may become particularly compelling. *See Diersen v. Chicago Car Exch.*, 110 F.3d 481, 489 (7th Cir.1997); *Humphreys v. Roche Biomed. Lab. Inc.*, 990 F.2d 1078, 1082 (8th Cir.1993); *Union Planters Nat'l Leasing Inc. v. Woods*, 687 F.2d 117, 121 (5th Cir.1982); *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 n. 2 (5th Cir.1981). Thus, while bearing in mind the liberal pleading philosophy of the federal rules, *Adams*, 739 F.2d at 864, the question of undue delay requires that we focus on the movant's reasons for not amending sooner. *Id.* at 868.

*Id.*

Wexford presents arguments of undue delay and prejudice in favor of denying the Plaintiff's motion. Wexford's Brief, p. 6. The presence of undue delay alone in this instance is sufficient to deny the Plaintiff's motion.

The case *sub judice* is progressing very slowly to trial in light of the various matters that required resolution today and in the past. Wexford is the only defendant that filed an answer to the Amended Complaint and certainly seeks a resolution to the outstanding claims of the Plaintiff. That is not to say that the other defendants do not also seek resolution of the Plaintiff's claims, but Wexford has progressed one step further than the others while also filing a motion to dismiss and/or for summary judgment. Fact discovery in this matter is long completed. Expert discovery has been produced by the parties. Wexford clearly is concerned about the Plaintiff being granted continued permission to amend his complaints to add a new claim that could have been added previously. To permit the addition of a negligence count at this juncture would certainly require another review by the parties' experts regarding this matter in order to evaluate possible negligence instead of alleged deliberate indifference of the defendants. The negligence count itself is very terse with little detail. Plaintiff's Motion, Exhibit A, p. 21. While the Plaintiff may believe the argument that no further discovery is needed for

101

the negligence claim to continue and thus prejudice to Wexford does not exist, *see Adams v. Gould, Inc.*, 739 F.2d 858, 869 (3d Cir. 1984), this fact under the present circumstances also cuts against the idea of permitting amendment because it indicates that the fact discovery completed over nineteen months ago would have revealed the existence of this claim at that time. *See* Plaintiff's Motion, ¶ ¶ 12-14; *Cureton* at 275. Moreover, the Plaintiff states his motivation in seeking this amendment: "While Plaintiff vigorously disputes the Defendants' assertions [that the Plaintiff's Eighth Amendment claims establish no more than a claim of negligence], Plaintiff now seeks to add a new state law claim of negligence to directly respond to the Defendants' argument that Plaintiff failed to state a claim against certain Defendants." Plaintiff's Brief (Document No. 138), p. 6 (footnote omitted). The Court has already treated Wexford's motion as one seeking summary judgment. Therefore, the filing of an amended complaint in response to a motion to dismiss is not a procedural course that the Plaintiff can argue is an option in this instance. To allow the Plaintiff to attempt to rescue arguments dismissed under an Eighth Amendment claim by filing a new negligence claim would fly in the face of judicial economy and summary judgment practice. The Plaintiff's failure to realize the weaknesses of his Eight Amendment arguments is no basis to permit amendment the same day many of the Eighth Amendment arguments are dismissed. If the Plaintiff truly wanted to add a negligence claim not previously made in the Complaint, but revealed in discovery, he could have done so when he filed an Amended Complaint in January of this year. The Plaintiff's motivations are not sufficient to attain leave to amend from the Court in view of his undue delay.

Procedurally speaking, the case *sub judice* finds the dismissal of some claims today as a result of the Court's ruling on the pending motions. The Plaintiff's motion was filed prior to our ruling today. The Plaintiff's amendment will cause further expert discovery and necessitate compliance with Pennsylvania Rule of Civil Procedure 1042.3 and possibly another round of summary judgment motions. The Court has already reviewed several hundred pages of briefs and records for the motions ruled upon today. Although it may have to endure another sequence of these filings from Khan, FCCG, Husain, Ocilka, Schuster and Greenleaf, it does not mean that Wexford should also have to do so. To Wexford's credit, it answered the Plaintiff's Amended Complaint and moved for summary judgment in the hopes of attaining a resolution of the Plaintiff's claims. The Court respects Wexford's desire to proceed with this litigation. Further amendments will present prejudice to Wexford and the Court as well. The Plaintiff's Motion to amend his Amended Complaint is denied as to Wexford.

An appropriate Order follows.

**AND NOW**, this 16th day of November, 2007, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED AS FOLLOWS:

1) The Corrections Defendants' Motion to Dismiss (Document No. 104) is GRANTED IN PART as to the Eighth Amendment liability argument against Defendants Smith and Hoyt for deliberate indifference to serious medical needs of the Decedent and as to any of the Plaintiff's ADA claims that could be based on conduct that does not also possibly violate that Eighth Amendment and the Plaintiff is granted leave to amend within twenty days of today's date his second Amended Complaint, (*see* Number 7 herein), limited to amending his allegations as to these two issues, GRANTED IN PART as to the Plaintiff's ADA and RA claims and said claims are dismissed with prejudice and DENIED IN PART as to all remaining arguments;

2) Husain's Motion to Dismiss Amended Complaint, or in the alternative, for Summary Judgment (Document No. 115) is GRANTED IN PART as to the Plaintiff's ADA and RA claims and said claims are dismissed with prejudice, GRANTED IN PART as to the Eighth Amendment argument as to Husain's prescription of Artane generally and the submission of Husain's credentials to Wexford and DENIED IN PART as to all remaining arguments;

3) Khan's Motion to Dismiss/Motion for Summary Judgment (Document No. 114) is GRANTED IN PART as to the Plaintiff's ADA and RA claims and said claims are dismissed with prejudice, GRANTED IN PART as to the Eighth Amendment argument as to Husain's prescription of Artane generally and the submission of Husain's credentials to Wexford and DENIED IN PART as to all remaining arguments;

4) FCCG's Motion to Dismiss Plaintiff's Amended Complaint, or in the alternative Motion for Summary Judgment (Document No. 125) is GRANTED IN PART as to the Plaintiff's ADA claim and said claim is dismissed with prejudice and GRANTED IN PART as to the Plaintiff's Eighth Amendment argument as to the policy or custom of hiring short-term psychiatrists and DENIED IN PART as to all remaining arguments.

5) Wexford's Motion for Summary Judgment (Document No. 135) is GRANTED at to the Plaintiff's Eighth Amendment claims and GRANTED IN PART as to all of the Plaintiff's arguments in favor of his ADA claim with the exception of the acquiescence argument, in which the motion is DENIED IN PART; and

6) Plaintiff's Motion Seeking Leave to File a Second Amended Complaint to Add Count III (Document No. 137) is GRANTED IN PART as to Defendants Husain, Khan, FCCG, Ocilka, Schuster and Greenleaf and DENIED IN PART as to Wexford and said Second Amended Complaint shall be filed within twenty days of the date of this Order.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**